UNITED STATES of America ex rel.
William R. LISS, Petitioner-
Appellant,

v.

Vincent R. MANCUSI, Warden, Attica
State Prison, Respondent.

No. 716, Docket 34135.

United States Court of Appeals,
Second Circuit.

Argued April 30, 1970.

Decided June 1, 1970.

Gilbert Sandler, New York City, for petitioner-appellant.

Amy Juviler, Asst. Atty. Gen., State of New York (Louis J. Lefkowitz, Atty. Gen., and Samuel A. Hirshowitz, First Asst. Atty. Gen., State of New York, on the brief), for respondent.

Before HAYS, ANDERSON and FEINBERG, Circuit Judges.

ANDERSON, Circuit Judge:

Late in the evening of December 21, 1958, at Laughlin's bar in Buffalo, New York, the petitioner William R. Liss met Mrs. Judy McCullom, 22 years old, whom he had known for about a year. They had a drink there, then went to a restaurant where they had dinner, after which they betook themselves to Liss' apartment. While there he strangled Mrs. McCullom and removed her body to the embankment of the Niagara River, where he concealed it. The frozen remains were discovered December 25th. Following preliminary investigations, on December 27th the Buffalo police searched for Liss, who evaded them for a day and a half during which he wandered the streets and then telephoned his employer, who was a lawyer, and sought his advice. Liss told him that the police were looking for him and the lawyer advised Liss to surrender himself to them, which he did at about 6 p. m. on December 28th.

Liss admitted his acquaintance with Mrs. McCullom but denied knowing anything about her death. Two detectives sought to question him for about an hour, but he refused to answer unless he could first talk to his wife.[1] He was per-

---

1. Liss had been separated from his wife for a number of years because of marital difficulties, in spite of which they con- tinued to see each other quite often and remained friendly.

mitted to telephone her, and she came to the police headquarters with her father and brother. The questioning of Liss, without warning of constitutional rights, was resumed in their presence. They had told the police that Liss had been under psychiatric care for several months at Buffalo General Hospital,[2] and the interrogation turned into a discussion of the possibility of arrangements for further psychiatric treatment and care. Liss was assured by the police that such treatment would be given him. Police Lieutenant Whalen recounted the experience of a relative of his, charged with killing his infant child, who was sent to the Mattewan State Hospital for the criminally insane for treatment and who, after being cured, was released. After some encouragement by his wife, to whom he had already confessed the slaying, Liss told the police about the events leading up to and including the killing of Mrs. McCullom and the disposition of her body. This statement was made about three and a half hours after Liss placed himself in the custody of the police. While giving it, he asked for something to eat and a meal was furnished him. On the following morning, December 29th, after Liss had slept and again eaten, he made a second statement in which he reiterated the strangling of Mrs. McCullom and recited further details about his activities between December 21st and 28th.

Liss was indicted for first degree murder, and on May 7, 1959, he was put on trial in the Erie County Court before a judge and jury. He relied on the defense of insanity and did not take the witness stand. On May 13, the jury found Liss guilty of murder in the second degree, and on May 27th he was sentenced to a term of twenty years to life, the mandatory minimum sentence. The Appellate Division affirmed without opinion, 11 A.D.2d 754, 204 N.Y.S.2d 344 (4th Dept. 1960), as did the New York

Court of Appeals, 9 N.Y.2d 999, 218 N.Y.S.2d 69, 176 N.E.2d 517 (1961). Appellant's subsequent petition for a writ of error *coram nobis* was denied without a hearing by the court and both the Appellate Division and the Court of Appeals affirmed. People v. Liss, 14 N.Y.2d 570, 248 N.Y.S.2d 660, 198 N.E.2d 45 (1964).

On April 27, 1964, the appellant filed a petition for a writ of habeas corpus in the United States District Court, Western District of New York, challenging, *inter alia*, the voluntariness of his statements to the police. Consideration of this petition was postponed, however, pending the outcome of a hearing which had been ordered in Liss' case by the Erie County Court following the State Court of Appeals decision in People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965). The *Huntley* hearing was held in November, 1965, and on February 28, 1966, the state court denied appellant's petition after finding "beyond a reasonable doubt that the said statements of the defendant were voluntary." The Appellate Division affirmed, 27 A.D.2d 906, 281 N.Y.S.2d 740 (4th Dept. 1967), as did the New York Court of Appeals, 23 N.Y.2d 688, 295 N.Y.S.2d 939, 243 N.E.2d 155 (1968). The Supreme Court denied certiorari, Liss v. New York, 395 U.S. 980, 89 S.Ct. 2139, 23 L.Ed.2d 769 (1969).

Following the New York Court of Appeals' affirmance in 1968 of the denial of relief in the *Huntley* proceeding, the United States District Court, for the Western District of New York, took up appellant's petition for federal habeas corpus. After examining the findings and record from the state *Huntley* hearing, the district court denied the application for the writ; it found that "[t]he statements of the defendant received in evidence at trial were voluntary statements, beyond a reasonable doubt." [3] We

---

2. Apparently Liss had suffered some mental difficulty for a number of years and in 1951 had been implicated in the slaying of one Bernice Dodge.

3. In addition to challenging the voluntariness of his confession, Liss also claimed in the district court that his trial counsel failed thoroughly to investigate the case,

granted a certificate of probable cause, leave to appeal *in forma pauperis*, and appointed counsel.

On this appeal Liss challenges the district court's determination that he had received a full and fair hearing in the state courts, and argues, in essence, that reliance on the factual determinations of the State Supreme Court was an insufficient basis for the denial of a federal hearing. Liss also asserts that, even if the hearing was properly denied, the finding that the confessions were made voluntarily is clearly erroneous as shown by the uncontroverted facts.

▇ While the opinion of the state court is hardly a model of clarity and completeness, for the purposes of Townsend v. Sain, 372 U.S. 293, 312–314, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), nevertheless, the state *Huntley* hearing judge's view of the facts is sufficiently plain to reconstruct the findings on which his conclusions were predicated. Study of the record before us and the reading of the entire transcript of the *Huntley* hearing satisfies us, as it did the district court, that the petitioner received a full and fair hearing in the state court as required by Townsend v. Sain, *supra.*

The petitioner's claim that the two confessions introduced against him at his trial were coerced and involuntary as a matter of law, and that, therefore, his federal constitutional rights were violated and his conviction of second degree murder was invalid, is not substantiated by clear and uncontradicted evidence, as petitioner asserts; rather the issue arises out of conflicting evidence and proof of surrounding circumstances which serve to support the state trial judge's conclusion that "beyond a reasonable doubt * * * the said statements of the defendant were voluntary."

Petitioner at the *Huntley* hearing told of having been without food or sleep for 38 hours before his arrest, that he had walked five miles, stood in a garage and sat on a roof in the winter chill when he was lightly clad and arrived at the police station hungry, exhausted and nervous. He also asserted that though the police knew all this, they refused to let him rest or eat until he had confessed. He also said, however, that he spent the day before he surrendered himself in the basement of a building where he was at least sheltered and could have slept. Just prior to this time, he had had money with which he purchased beer. Liss was only in custody of the police for about an hour, during which time he refused to answer any questions, before his wife and her father and brother arrived. They remained continuously with him up to and including his first confession. When Liss asked for something to eat his brother-in-law got him a meal. The *Huntley* hearing judge was not in error in rejecting Liss' claim that the police were coercing him by withholding food and sleep. The court was not compelled to believe Liss under circumstances where his family was continuously present and yet no one corroborated Liss' statement.[4] On the morning following

---

that he had been induced by his counsel to sign an involuntary pretrial agreement to the effect that he would not testify on his own behalf, that the deceased had died in Niagara rather than Erie County and that therefore the state trial court lacked jurisdiction over the crime. The district court found that Liss had failed to exhaust state remedies as to his claim on the competency of his counsel, found no merit to the claim relating to the pretrial agreement, and found that the claim involving the jurisdiction of the Erie County Court did not present a federal constitutional question. Liss does not press these three claims on appeal.

4. The petitioner takes the position that anything to which he testified at the *Huntley* hearing which was not specifically contradicted by respondent's witnesses was required to be considered true and found as a fact by the trial judge. He cites Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), in support of this proposition. In that case the Court refrained from deciding whether petitioner's testimony alone in the light of equivocal testimony on the same subjects by the state's witnesses would warrant a holding that the confession was coerced. It said, "We need not pursue such an inquiry, however,

his first statement, after he had had a full night's sleep and food, he made his second statement which reiterated essential parts of his first statement and added details and explanations; but it is barren of any suggestion that his first statement was the product of a weakened and exhausted condition or resulted from coercion or was not his own. Moreover, Liss had already confessed the homicide to his wife before he turned himself in. Similarly, Liss' claim, made for the first time at the *Huntley* hearing, that at the interrogation he had continually asked for a lawyer to represent him, could also, under the circumstances, be disbelieved by the court.

It was not disputed that a promise of psychiatric attention was made prior to the first confession as is attested to by the statement itself.[5] The issue before the state court was, therefore, the nature of this promise and its effect on Liss.[6] The state court's finding that Liss had never even claimed his confession to be induced by the promise of psychiatric care is central to both the state and federal judgments. If, when Liss went to the police headquarters, he assumed that he could continue to receive the psychiatric care which was being given him at Buffalo General Hospital, it is fair to infer that a mere promise of the continuation of that treatment would not have been sufficient to prompt a confession. On the other hand, if the promise had been that he would receive psychiatric care instead of imprisonment, as alleged in the petition, the more logical inference would be that there was inducement. Thus, from the finding that it was not the promise that persuaded Liss to confess, it can be inferred that the promise was not one ultimately of psychiatric care in lieu of imprisonment, but a continuation of the treatment which would ultimately relieve him of the impulses of which he appeared to be aware and which were bedevilling him.

The *Huntley* hearing record supports this reconstruction of the findings. Although the testimony of appellant's brother-in-law agreed with Liss' contention that he had been promised relief

since the record contains other probative, convincing, and uncontradicted testimony." These factors were sufficiently corroborative to cause the Court to declare the confession coerced and invalid. In the present case the surrounding circumstances were quite the opposite. Unlike *Haynes*, who was kept incommunicado for 16 hours and refused leave to call his wife unless he confessed and was kept under the same pressure to make further admissions even after he had confessed, Liss had his family with him, had ready contact with the outside world, and the circumstances were not coercive.

5. While giving his statement, Liss responded to questions relating to his treatment at the hands of the police and the nature of any promises made to him as follows:

"Q. Have you any complaint to make to me of the manner in which you have been treated by the police? A. No.
"Q. Have you been mistreated in any manner? A. No.
"Q. Have any promises of any kind been made to you? A. Yes.
"Q. What promises were made to you? A. I was promised that I would get psychiatric treatment.

"Q. And was that the only promise, was it? A. I don't recall, I can't think.
"Q. You haven't been promised immunity by anyone, have you? A. No.
"Q. This statement has been made by you voluntarily, has it? A. Yes."

6. The portion of the *Huntley* hearing judge's memorandum which relates to this issue is the following:

"From the credible and material evidence submitted, the Court does not find ample support for the defendant's contentions. It further finds beyond a reasonable doubt that the said statements of the defendant were voluntary. "In making these determinations, the Court took particular note of certain facts which it appears appropriate to mention. * * * The medical records indicated the defendant to be of average intelligence. They further disclosed that he was receiving competent psychiatric treatment as an out-patient at the Buffalo General Hospital. His last psychiatric consultation was within one week of the crime for which he was indicted. Prior to the date of the hearing, he never claimed that his statements were *induced* by a promise of psychiatric treatment."

from imprisonment if he confessed, the testimony of the police lieutenant, corroborated by that of appellant's wife and father-in-law, was that no such promise had been made. The finding that the discussion of psychiatric care merely led to a promise that such treatment and care would be afforded was within the competency and authority of the trier. The conclusion that such a promise did not induce the confession is supported by that part of the record where Liss himself, in response to questions from the bench, testified that when he turned himself in at police headquarters he understood he could continue to receive psychiatric care at Buffalo General Hospital and that he did not have to be admitted to Mattewan.[7]

Of course, no reconstruction of the facts could be made if it were not clear that the state trial court had applied correct constitutional standards. Townsend v. Sain, *supra*, 372 U.S. at 314, 83 S.Ct. 745, 9 L.Ed.2d 770. We are satisfied that the court did so in this case. The measure in testing the voluntary or involuntary nature of a confession made in 1958 is whether or not under the totality of circumstances such pressure was exerted upon the suspect through threats, infliction of fear or pain or making of inducements and promises that his will was overborne. Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); see also summary of pre-1966 cases in dissent by Harlan, J., in Miranda v. Arizona, 384 U.S. 436, 507–509, 86 S.Ct. 1602, 16 L.Ed.2d 694.

Liss emphasizes the fact that he received no warning of his constitutional rights;[8] and it is obvious that at the state court *Huntley* hearing (held six

7. The colloquy between Liss and the state judge was as follows:
    The Court: Mr. Liss, when you went to the Police Headquarters, did you feel that you needed psychiatric care?
    The Witness: Well, I—
    The Court: Had you been receiving psychiatric care as an out-patient at the Buffalo General Hospital?
    The Witness: Yes, sir.
    The Court: And were you still in the process of receiving that care at the time you went to Police Headquarters?
    The Witness: Yes, your Honor.
    The Court: When you went to Buffalo Police Headquarters, did you feel you needed that?
    The Witness: That was the reason I went to Buffalo Police Headquarters.
    The Court: I realize that. Did you feel you still needed care at the time you went to Headquarters?
    The Witness: Yes, I did.
    The Court: Did you understand that you could get this treatment, continue to get this treatment at Buffalo General Hospital, or—
    The Witness: Yes.
    The Court: (cont'g.)—other psychiatric hospitals?
    The Witness: Well, as long as I was getting it at Buffalo General, I was satisfied, sir.
    The Court: You didn't feel that you had to go to Mattewan to get it, did you?
    The Witness: No. I mean I don't —I mean I went to the hospital and I was receiving psychiatric treatment then, and I thought in due time that they would well, get to the bottom of my problems."

8. The absence of warnings was a factor to be considered as evidence of the possible involuntary nature of the confessions, but it was not conclusive. The *Huntley* hearing judge was entitled to consider the generally non-coercive circumstances attending the confessions as well as the evidence that the petitioner refused to submit to interrogation except on his own terms and that, though he insisted on these, he had a compelling urge to purge his conscience of a sense of guilt by telling about the slaying; that he wanted to get it off his mind and that he wanted treatment to relieve him of the hostile impulses that had made him do it. The judge was also entitled to consider that the confession was in question and answer form, that the questions were not caustic, hostile or barbed but designed to turn attention to particular phases of the occurrences relating to the matter under investigation and that petitioner's answers flowed out freely and fully without prompting or anything in the nature of cross-examination by anyone.

years after his arrest) and in his subsequent claims in the federal courts, he has sought to include those constitutional rights which were first recognized several years after his arrest in Escobedo v. Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and Miranda v. Arizona, *supra*, the retrospective application of which was denied in Johnson v. New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966).

Liss also cites Clewis v. Texas, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967), and Greenwald v. Wisconsin, 390 U.S. 519, 88 S.Ct. 1152, 20 L.Ed.2d 77 (1968), on the basis of which two judges of the State Court of Appeals dissented from the majority of the court in reviewing Liss' *Huntley* hearing, as authority for his claim that the circumstances attending the taking of his confessions inevitably made them involuntary. But these cases are readily distinguishable from the case before us. In *Clewis* the defendant had been held and interrogated for 38 hours by the police before he was taken before a magistrate and thereafter was questioned by numerous police officers fairly often for three more days without representation by counsel. He had been given no warnings of his rights; he had received very little food and very little sleep; and, although ill, had been denied treatment and medication. In *Greenwald* the defendant was given no food even though held overnight by the police, was not warned of his rights, was denied medication for high blood pressure, and was interrogated by several police officers at a time while alone in a small room. In both instances the Supreme Court found that in the totality of the circumstances the respective confessions were involuntary.

■ While Liss was not informed of his constitutional rights, his wife and other relatives were permitted to be present during the questioning, which was not the long, grueling session usually shown in cases of over-reaching by the police. It was but three and one-half hours in length and was not aggressive, leading and compulsive in nature, or in-

tense and coercive in atmosphere, but relaxed and conversational in tone. It is our opinion that the record supports the conclusions of both the state and federal courts that in the totality of the circumstances appellant's will was not overborne and his confessions were not involuntary. Johnson v. New Jersey, 384 U.S. 719, 730–731, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966); United States ex rel. Coleman v. Mancusi, 423 F.2d 985 (2 Cir. March 4, 1970).

The judgment of the district court is affirmed.