**UNITED STATES of America,**
**Appellee,**

v.

**Joseph H. GREENBERG, Defendant-**
**Appellant.**

**No. 99, Docket 34838.**

United States Court of Appeals,
Second Circuit.

Argued Oct. 8, 1970.

Decided July 26, 1971.

Sidney R. Siben, Bay Shore, N. Y.
(Siben & Siben, Bay Shore, N. Y. and
Daniel Kirchman, New York City, of
counsel and on the brief), for defend-
ant-appellant.

James Schreiber, Asst. U. S. Atty.,
New York City (Whitney North Sey-
mour, Jr., U. S. Atty. S. D. N. Y., New
York City, William J. Gilbreth and Ross
Sandler, Asst. U. S. Attys., on the brief),
for appellee.

Before MOORE, SMITH and AN-DERSON, Circuit Judges.

MOORE, Circuit Judge:

The defendant, Joseph H. Greenberg (Greenberg), appeals from a judgment of conviction (after a trial before judge and jury) of conspiring with Sidney Romanoff (not a defendant) (Romanoff) to violate sections 201(b)[1] and 201(f)[2] of Title 18 United States Code, namely, laws prohibiting the bribery of, and the giving of gratuities to, public officials. Greenberg presents eighteen appellate questions which can be substantially condensed. In substance he claims (1) that the Government promised to call his alleged co-conspirator Romanoff but failed to do so and thus deprived him of an opportunity to cross-examine Romanoff; (2) that he was entrapped into committing the crime by a Government agent; (3) that there was no proof of any conspiracy; and (4) that the charge was erroneous.

First, brief comment as to the circumstances which gave rise to this case. Anxious to ferret out corruption of, and the acceptance of bribes by, Internal Revenue Agents, the Internal Revenue Service (IRS) assigned to Harold Wenig, one of its Inspectors, the unenviable task of posing as a dishonest and corruptible Agent and in this role to seek the confidences of other Agents who might have sought to supplement their governmental salary by the receipt of monetary rewards from taxpayers and/or their accountants for favorable tax treatment on their audits. However, the investigation was not aimed at having the taxpayers and/or their accountants reveal bribes which they had paid to Agents (probably incapable of achievement for constitutional and other more practical reasons) but rather, without the benefit of any such direct proof, to provide opportunity for guilt-conscious Agents to commit their own crimes of bribery by giving money to an IRS Agent to fix or at least help their own situations. The Government argues that "Greenberg was ready and willing without persuasion to commit the crime when the opportunity presented itself." Gov't Br. p. 12. Needless to say, Greenberg asserts that he was the victim of Wenig's "campaign to instill terror in the heart of the defendant."—hence, entrapment of the foulest sort. Greenberg Br. p. 14. The facts, such as they are, come only from Wenig, the sole witness; Greenberg did not take the stand.

For purposes of his undercover work, Wenig used the alias "Harold Springer." Wenig told another Agent, Sidney Romanoff, alias "Mr. Randy," that "something had come up" on Greenberg. As the result of a telephone call initiated by Wenig to Romanoff, Romanoff on behalf of Wenig undertook the task of inquiring whether Greenberg would want to meet Wenig. Romanoff must have obtained an affirmative response because

---

1. Title 18, § 201(b):
 "(b) Whoever, directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent—
 (1) to influence any official act; or
 (2) to influence such public official or person who has been selected to be a public official to commit or aid in committing, or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or

 (3) to induce such public official or such person who has been selected to be a public official to do or omit to do any act in violation of his lawful duty, or"

2. Title 18, § 201(f):
 "(f) Whoever, otherwise than as provided by law for the proper discharge of official duty, directly or indirectly gives, offers, or promises anything of value to any public official, former public official, or person selected to be a public official, for or because of any official act performed or to be performed by such public official, former public official, or person selected to be a public official; or"

he advised Wenig that a meeting had been arranged for November 6, 1967, at an appointed place at Roosevelt Field at about 3:00 p.m. Greenberg did not know Wenig. However, Wenig made the introduction by saying "I'm a friend of Sid's [Romanoff]." Apparently word had come to Greenberg, presumably via Romanoff, that if he wished to play in the Wenig game, the opener was $200 because shortly after Greenberg entered Wenig's car, Greenberg, unsolicited, gave Wenig $200. Wenig had a 3x5 card which purported to contain information about some of Greenberg's audits and in particular the R-Trot Company and the Axinn Lumber Company. Greenberg indicated that he "did business" with the R-Trot accountant but that nobody else was present.

Wenig had come to the November 6, 1967 meeting equipped with electronic recording devices which would have been much envied (or possibly scorned) by Sherlock Holmes. He had been similarly electronically clad in his telephone conversations with Romanoff. A radio transmitter was secreted on his person and a tape recorder on which to record the Greenberg conversations was in the trunk of his car. The transcript such as was audible and decipherable was introduced in evidence. There is no doubt that Wenig made no effort to minimize his concept of the seriousness of Greenberg's position but he magnanimously offered to be of help by arranging to have Greenberg's "problem" cases fall into the right hands—obviously his. A code name of "Grayson" was assigned by Wenig to Greenberg.

Between November 6th and November 17th, there were several telephone calls between "Springer" and "Grayson" which resulted in a second meeting in Wenig's car at Roosevelt Field, all of which was recorded, taped and played to the jury. Wenig produced a two-page list of 51 taxpayers whose returns had been audited by Greenberg. Wenig then represented that these taxpayers and their accountants were about to be interviewed regarding possible bribes paid to Greenberg but that he (Wenig) would be in charge of the investigation and could prevent any adverse action if he knew the names on the list from whom Greenberg had received bribes from the taxpayer or his accountant. Greenberg checked 17 names. In all cases but one the bribe was handled by the accountant; in one instance by the taxpayer directly and so marked by Greenberg on the list by the letter "T."

The meeting concluded with a payment by Greenberg to Wenig of $150 which was "on account."

---

■ The primary objective of an appellate court is to assure itself from the record that the defendant is, in fact, guilty of the crime charged and that the defendant has not been convicted after a trial in which material evidence has been improperly admitted or excluded and the jury erroneously instructed as to the law. The answer here depends upon whether Wenig caused Greenberg to commit a crime or whether he merely presented a favorable setting for Greenberg to do so. If "entrapment" be used in its colloquial sense, there is little doubt that Wenig set out to entrap Greenberg and as many other agents as would fly into his web. This was his job. Detection of crime often calls for subterfuge—witness the narcotics informant or undercover agent and the plainclothes police officer. However, here the facts militate against "entrapment" used in its legal sense.

■ Through Romanoff, Greenberg voluntarily appeared at Roosevelt Field. He must have known of Wenig's standard $200 retainer. His disclosures revealed some worry at least about his conduct in the past. He was quite willing to keep the lines of communication open between November 6th and 17th. On the 17th, Greenberg took the affirmative in checking the taxpayers' names with whom he had done "business"; and voluntarily made the second payment $150 on account. Upon these facts, the jury could have justifiably concluded

that Greenberg thereby desired to influence Wenig in the course of his Inspector's activities.

■ So much for the merits. Greenberg's appellate points relate chiefly to the conduct of the trial. Apparently an unidentified man might have been responsible for an initial meeting in September 1966 between Romanoff and Wenig. The Trial Court sustained the Government's preference to keep the name confidential. Greenberg now claims that this unidentified person would have established a governmental conspiracy to entrap. This assumption rests upon a highly speculative foundation. Greenberg did not even seek the aid of, or to call, Romanoff for this purpose. Instead Greenberg relies upon a statement by the prosecutor in his opening and during Wenig's direct examination that the government would call Romanoff.[3] The government argues that this representation was "mistakenly said"; that it was "erroneously said"; that it was a "slip of the tongue"; and that he "misspoke and used the wrong word." No matter what the reason, the representation was the basis for the Trial Court's admission of the conversation. At the conclusion of the Government's case, defense counsel moved to strike the Wenig-Romanoff testimony. The motion was denied. Quaere, whether this constitutes reversible error? If there were any connection it was indeed very thin. However, all surrounding circumstances must be considered. The government had advised defense counsel that it might rest without calling Romanoff. Romanoff's position in the alleged conspiracy was known from the day of this indictment. There was no showing that Greenberg did not have an equal opportunity to interview or subpoena Romanoff. Had there been any question as to Romanoff's participation

either in the conspiracy or in the Wenig conversation, he could at least have presented his version. In the light of the far more important facts relating to Greenberg's dealings with Wenig, this incident can be placed in the category of harmless error.

■ This Romanoff point, however, leads directly to Greenberg's "no conspiracy" argument. Conspiracy here does depend on inferences—were they justifiable? Greenberg did not take the stand as was his right. Therefore, his version of the transaction was not the subject of direct evidence by him. He did not call Romanoff. Wenig's testimony, direct and cross, was all that court and jury had before them upon which to draw their own inferences. However, Romanoff's participation in the preliminaries and Greenberg's subsequent acts were sufficient for this purpose.

■ As to the charge, both the Trial Court was, and this reviewing court is, handicapped by lack of any objection upon the trial. The Trial Court should have been given the opportunity to supplement or modify the charge had a request to do so been made. Greenberg on appeal is forced to rely upon the "plain error" theory. However, the error is not that "plain." The errors assigned will be treated *seriatim:*

1. It might have been better procedure not to have told the jury that if they convicted upon an erroneous charge they did not "have to worry" because this court would reverse if there were error. This might have lessened the jury's sense of responsibility but such a reaction would be unlikely.

2. To tell the jury that this was an "offense of grave character" was an accurate depiction of the crime.

---

3. When the prosecutor tried to introduce a Wenig-Romanoff conversation, Greenberg's counsel properly objected, saying: "There is no showing for a conspiracy. I don't even know whether Mr. Romanoff will be here, frankly." The prosecutor then represented that "This is going to be connected up with the testimony of

this witness to show the conspiratorial agreement." and "Mr. Romanoff will testify to events which will connect this testimony with the defendant." Upon this representation, the Court received this otherwise inadmissible conversation "subject to connection."

3. Greenberg complains that the charge on the subject of conspiracy was "sterile and academic." No substitute was offered. Since time immemorial, charges as to conspiracy have been subject to the same objection. Neither the ingenuity of court or counsel have been able to devise a format which will instruct a jury with certainty as to the factual weight which must be placed on the scale to move the needle to the area of "conspiracy" or "beyond a reasonable doubt."

4. The issue of "derogatory" material in the IRS files relating to Greenberg was properly handled by the Trial Court.

5. As to the failure by the Government and by Greenberg to call Romanoff, the charge of equal availability and "no unfavorable inference" was fair to both sides.

 The objection to the introduction of the tape recordings of the Wenig-Greenberg conversations was overruled. This ruling is sustained. United States v. White, 401 U.S. 745, 748–754, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971), rev'g 405 F.2d 838 (7th Cir. 1969); United States v. Kaufer, 406 F.2d 550 (2d Cir.), aff'd 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969).

Affirmed.