**UNITED STATES of America ex rel. Harry L. SANNEY, Petitioner,**

v.

**Ernest L. MONTANYE, Warden of Attica Correctional Facility, Attica, New York, Respondent.**

**Civ. No. 1972–328.**

United States District Court, W. D. New York.

Oct. 9, 1973.

Herman Schwartz, Edward I. Koren, Buffalo, N. Y., for petitioner.

Louis J. Lefkowitz, Atty. Gen., of the State of New York (Bedros Odian, Buffalo, N. Y., of counsel), for respondent.

CURTIN, District Judge.

This case involves a petition for a writ of habeas corpus filed by a state prisoner. In a previous decision reported at 352 F.Supp. 947, D.C., the court discussed the state proceedings in the case and held that petitioner was entitled to raise his claims in this court notwithstanding his entry of a plea of guilty in the state trial court.

Before proceeding to the merits, one additional point on this issue should be noted. At the time petitioner entered his plea of guilty three sections of the former New York Code of Criminal Procedure allowed appeal of certain claims notwithstanding the entry of a plea of guilty. Section 813–g allowed appeal of claims relating to allegedly involuntary confessions. Section 813–c permitted appeal of claims relating to allegedly unlawful searches and seizures of tangible items, See People v. Habel, 25 A.D.2d 182, 268 N.Y.S.2d 94, aff'd, 18 N.Y.2d 148, 272 N.Y.S.2d 357, 219 N.E.2d 183 (1966), appeal dismissed, 388 U.S. 451, 87 S.Ct. 2104, 18 L.Ed.2d 1313 (1967), while Section 813–m(4) allowed appeal of claims relating to allegedly illegal interceptions of conversations. As indicated below, petitioner's claims concern an allegedly involuntary confession and an allegedly illegal interception of a conversation and thus were appealable pursuant to Sections 813–g and 813–m(4).

Petitioner does not contend that a hearing is required in his case. He concedes that the facts pertaining to his claims are those revealed in the testimony presented to the grand jury in his case. (Letter from Herman Schwartz, June 12, 1973.) The facts so revealed are as follows:

In December 1965 petitioner reported to the police that he had found the body of one Charles Reynolds in a coal yard in the city of Lockport, New York. Although petitioner became a suspect in

the case and was questioned by the police, he was not arrested at that time.

In February 1966 petitioner applied for a job at the Reid Petroleum Corporation in Lockport. As a condition of employment he was required to take a polygraph test, which was administered on February 5 by John Bewick, Jr., a polygraph operator retained by Reid as a consultant. During a conversation preliminary to the actual test, petitioner revealed to Bewick that he had been a suspect in the Reynolds case and that he had not told the police that he had hit or pushed the victim.[1]

Bewick reported what he had learned to the police, who thereupon arranged for him to conduct a second polygraph test of petitioner at which Bewick would be equipped with a concealed electronic

---

1. Bewick described the portion of the conversation in which petitioner made his confession as follows:

Q. Would you try to recall then as well as you can at this time the substance of that oral conversation you had with Harry Sanney on February 5th? A. All right. Well, the original I followed with that form most of the conversation getting his name and address; places where he had worked; if he had ever been arrested. The form shows various blocks I would try to fill in. And in the course of it, he made those statement [sic] to me and I made the notes. And towards the end of the conversation it just was apparent he was very nervous. and that he was withholding something. He was uneasy about not having told me the complete truth. This was only a guess on my part. I talked to him along the lines as if I were correct in my guess and that there was something that he was concerned about. Now, at the time when I asked him if he had ever been arrested, he brought out the fact that he had been a suspect in an investigation of a murder.

Q. Was this conversation while you were *administering the polygraph test?* A. No. This previous.

Q. All right. A. That it had been a situation where he was picked up as a suspect and had been questioned about his knowledge of this murder. And that he had been released by the police; so he told me that as if that settled it; that was all there was to it. But I also recognized he was uneasy. I couldn't help but think maybe there was something to the information concerning that matter that he might be uneasy about. I more or less questioned him along those lines; that he was keeping something secret from me; holding something back about his arrest record. And I asked him why or what was the reason for his uneasiness. And he said, well, at first he said, "I don't want you—" he thought I was the employer—"I don't want you to know that I was arrested and besides being picked up for that and questioned in that murder." I said, "That won't make and [sic] difference if you can explain what happened." And he did not explain. He just said he had been arrested other times. I did not go into that any further. But about the suspected murder he had committed, I asked him about that and generally the way it came out he said he hadn't told the police everything when they had questioned him." I asked him: "Well, what didn't you tell them?" He said that he didn't tell them that he had hit or pushed the victim. I am not clear because his level of expression is very immature. He talks like a child. He is a very dull type of guy. And so at that time I said he cleared it up with me. I realized that I was—he was telling me something that was very different from what he told the police. He was actually getting a sense of relief or release from having told me this. So I talked to him further about it, where he had either hit him or pushed him; had it been—I had read the account in the paper in December and I somewhat knew the details of it. Then, of course, he told me he had been picked up about it. I brought in a lot of other details; had it been the laundermat [sic] or where he cleaned up.

Q. You mean the striking? A. The striking of the victim. He got kind of reluctant to discuss it beyond that point except to just say: "I hit him and I ain't going to tell you no more." Words to that effect. He was kind of completely crushed or emotional, very tired acting and very sorry and sad about it. I thought that he was worried about losing his job. He apparently didn't know that—or thought the employer hadn't read that account in the paper or connected it with him.

Q. Is that the total of your recollection of this conversation? A. Yes. At that point he knew that he was admitting something to me that he had been responsible for at least pushing or hitting this fellow who later was found to be killed.

transmitting device enabling the police to listen to and record the conversation. The second test was held at Reid's on February 8 after Reid informed petitioner that another test was necessary in his case. Petitioner was not given the warnings set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L. Ed.2d 694 (1966), and he was not made aware of the fact that Bewick was act-ing as an agent of the police and enabling them to eavesdrop on his conversation with Bewick. Indeed, at one point in the conversation Bewick answered in the negative to petitioner's question, "Is there a tape recorder?" During the conversation petitioner repeated and amplified the incriminating remarks he had made in his first conversation with Bewick.[2] At the conclusion of the test

2. The statements are as follows:

Q. I was hoping (next portion inaudible) you might have been a little upset Saturday, it is an upsetting fact, isn't it? A. Yes.

Q. What happened between you and Reynolds, his name is Reynolds? A. Peanuts.

Q. What happened between you and he, it was very disturbing, wasn't it and upsetting, wasn't it? A. Umhmm.

Q. To go over it again, did you tell me that you hit him? A. Yes.

Q. What, with what? A. An object.

Q. An object. Was it like a piece of wood or a piece of pipe? A. It wasn't no pipe.

Q. Was it like a 2 x 4? A. Yes.

Q. Where did you find it, on the floor, where? A. In the shed.

Q. In the shed. Where did you put it after you used it. You can tell me. Think. You have thought about it, haven't you, where did you put it? A. (First part inaudible)—I didn't want nobody to find it.

Q. Did he threaten you? A. Yes.

Q. Yes. What did he threaten to do, tell me. A. He said he was going to tell everybody what kind of a kid I was.

Q. What did he want you to do? A. He wanted me to have sex with him.

Q. When you wouldn't he threatened he was going to tell? A. Tell everybody.

Q. Did you smoke a cigar with him? A. No.

Q. Did you smoke anything with him like marijuana or cigarettes? A. A cigarette.

Q. A cigarette. Because I found out he was a cigar smoker. A. There were a couple cigars down there.

Q. I must have read that in the paper. How long were you down there with him? Did you go down there when, at 11 or 12 or 1 in the morning or when was it? This was what was keeping you from telling the truth. Give me the whole truth, you can tell me the truth. I know you didn't trust me. A. A little after 12.

Q. A little after 12 on the day he was found, that you found him? A. Yes.

Q. What did you do, did you walk or ride in a car or did you take a taxi, how did you get down there, isn't this far away from where you live? A. Up the street.

Q. What did you do? A. We walked.

Q. You walked together or did you meet him? A. (Inaudible.)

Q. I probably did. A. (Inaudible.)

Q. Does that mean yes? A. Yes.

Q. He asked you to have sex with him? A. Yes.

Q. Yes? A. Yes.

Q. And you refused? Did you refuse? A. Yes.

Q. You know I think it is good for you, instead of just nodding your head to say yes or no. Say it loud and clear. This is what is getting it off your chest. A. (Inaudible.)

. . . . .

Q. That is why I came back. I didn't do you any favors because I left you all worked up without the chance to let off steam. You blow off steam, not always by punching your fist down or doing something or getting drunk or anything like that, you might blow off steam by telling somebody a word of kindness between people but I am concerned about that incident that happened with Peanuts or Reynolds, if that is the end of the story. Did you get anything from him? A. No.

Q. You didn't. Did he have anything to take? A. I don't know.

Q. Did he have a cigarette lighter or watch or ring? A. Not that I know of. (Next part inaudible.) He didn't have no wallet or nothing.

Q. He didn't? A. That is what the paper said.

Q. I have been reading the paper, too. That is where I got my information from. I have been reading the paper since I talked to you. I was all alone when I read them. I want you to know that I did though. What time was it, noon or midnight? A. Midnight.

Q. Then what did you do, you struck him with this piece of wood, like a 2 x 4 and you left, where did you go? A. Home.

Q. To the Laundromat? A. Yes.

Q. Did you go up the stairs then to bed? A. Yes.

Q. You got up the next day and then what did you do, go back there, were you worried, nervous? A. (Inaudible.)— that was the first time I had seen that place. It was a big coal yard.

Q. I haven't been back there so I don't know. You walked in and looked where you remembered you had been with him? Where was he standing when you hit him, in back of you? A. In front of me.

Q. Were you arguing loudly; He was teasing you, wasn't he? A. Yes.

Q. Was the item, whatever it was, I don't care, was it just laying right there? A. Yes.

Q. Was it long or short, four feet, how long? A. About three feet.

Q. A good length, it wasn't just a little piece? A. Yes.

Q. (First portion inaudible)—you were there and you know how it happened. That is why I am suggesting to you—I am using my experience to say that maybe there is an opening here, Harry, where you could tell your story. What do you think, it is not going to be easy. A. No, I know it.

Q. It is going to take courage. A. But the thing of it is they all told me at the police station that the guy's head was all bashed in. (Next portion inaudible.)

Q. Yes. A. I know I couldn't have done it.

Q. You wouldn't have done it—put it that way—but you did hit him with a 2 x 4? A. Yes.

Q. It could have happened, Harry, was it dark? A. Yes.

Q. Did he fall? A. Yes.

Q. He fell down? Right? A. Right.

Q. Did you touch him after that, did you move him? A. No.

Q. Did you pick him up? A. I just ran.

Q. You ran, you ran after you hit him with a 2 x 4? A. Yes.

Q. Well, did you go anywhere else, did you go have a drink? A. (Inaudible.)

Q. Did you have to turn the lights out in the Laundromat or it goes all night? A. Yes.

Q. Anyone can go in there all night? A. Yes.

Q. I am concerned because you know the other day I asked you did you ever steal any money in your life. Remember I asked you that? Could it be that you took some money from Peanuts before or after this, and you felt that you hadn't earned it, that you took it dishonestly? A. No.

Q. Did he offer you money? A. No, what happened Peanuts was pretty well drunk (next portion inaudible).

Q. They knew he was drunk that night? A. What happened, he came in and my sister-in-law and I was down in the Laundromat. She was mopping the floor and I asked him very nicely if he would go and he just was sitting there and he wasn't doing anything (next portion inaudible). He brought in a couple dish towels.

Q. Just to be a smart aleck? A. Yes.

Q. So that he could come in and stay there? A. Then he jammed the nickel in the machine.

Q. Was he kind of trying to burn you up, do you think by doing that? A. I imagine he was.

Q. That was the way you took it anyhow? A. Yes, so I walked over and told him he couldn't put a nickel in because it took quarters. I took the nickel out and gave it back to him.

Q. You took the nickel away? A. I gave it back to him.

Q. Then what did you do, this wasn't in the paper? A. No.

Q. This wasn't in the paper, what did you do then? A. He put a quarter in and run the machine and went back to the table and I sat down and he was sitting right across from me. He kept watching me and I finally made up my mind to ask him what he was watching me for.

Q. What did he say? A. I want you to go out with me (next portion inaudible)

Q. He started teasing you there? Yes, my sister-in-law had already went upstairs.

Q. (First portion inaudible) so he made you mad right there, I thought it was later. A. No.

Q. Then what did he do, he left and he knew you were following him or were you going along with him, is that the idea, but you weren't? A. No.

Q. No, I see. You followed him. How did you go from the Laundromat, did you go up this way or this way? A. On Buffalo Street, down Buffalo Street.

Q. I am not from Lockport, I don't know the streets at all. A. (Inaudible.)

Q. Right near here? A. Yes.

Q. I see. How far ahead of you was he? A. (Inaudible.)

Q. He went all the way in and did he suggest that he have sex with you when you got inside? A. I was going to walk on by.

petitioner left Reid's to go home for lunch and was arrested by the police.

Petitioner contends that his second confession was obtained in violation of his rights under the fifth amendment. This contention encompasses three distinct claims, the first of which is that Bewick's interrogation imposed on petitioner an impermissible choice between self-incrimination and the loss of his newly acquired job. In support of this claim petitioner cites Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L. Ed.2d 562 (1967), a case in which police officers questioned about the alleged fixing of traffic tickets answered questions after a warning that they were entitled to remain silent and any information given might be used against them in any criminal prosecution but that if they refused to answer they would be subject to removal from office. In overturning convictions based on the answers of the policemen, the Supreme Court stated as follows:

> The choice given petitioners was either to forfeit their jobs or to incriminate themselves. The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent. *Id.* at 497, 87 S.Ct. at 618.

■■ *Garrity* is distinguishable from petitioner's case, however, on the ground that it concerned the forfeiture of a governmental benefit, public employment. As such, it represented a specific application of the general principle that the state may not condition the grant of a benefit or privilege upon the recipient's relinquishment of a constitutional right. *See* Jones v. State Board

of Education of Tennessee, 397 U.S. 31, 34, 90 S.Ct. 779, 25 L.Ed.2d 27 (1970) (dissenting opinion); Honolulu Rapid Transit Co. v. Dolim, 459 F.2d 551, 552 n. 2 (9th Cir.) cert. denied sub nom., Honolulu Rapid Transit Co., Ltd. v. Hawaii Public Utilities Commission, 409 U.S. 875, 93 S.Ct. 124, 34 L.Ed.2d 128 (1972). In contrast, petitioner's case involves no conditioning of a governmental benefit upon surrender of a constitutional right.

■■ Petitioner claims next that his second confession was obtained in violation of his rights under the fifth amendment because before questioning him Bewick did not give him the warnings required by Miranda v. Arizona, *supra*. The answer to this contention is that petitioner was not in custody when he was interrogated by Bewick. The test of whether questioning is custodial in nature is an objective one not "depend[ing] upon how [the] individual being questioned perceive[s] his situation." United States v. Hall, 421 F.2d 540, 544 (2d Cir. 1969), cert. denied, 397 U.S. 990, 90 S.Ct. 1123, 25 L.Ed.2d 398 (1970). To establish custody in the absence of actual arrest "something must be said or done by the authorities, either in their manner of approach or in the tone or extent of their questioning, which indicates that they would not have heeded a request to depart or to allow the suspect to do so." *Id.* at 545. Nothing in Bewick's conversation with petitioner indicates that *he* would not have allowed petitioner to terminate the conversation and leave the room. The fact that the eavesdropping police would probably have arrested petitioner had he tried to leave the room without incrimi-

---

■■

Q. But you were still mad at him? A. Yes.

Q. Angry? A. Yes, he made another remark toward me to come in.

Q. What did he say? Is it an embarrasisng [sic] remark? What was it? I am a grown man. I have heard these things before. What did he say that was embarrassing, you won't embarrass

me. A. He wanted me to give him a blow job.

Q. He requested you to come in to give him a blow job? A. That made me awful mad.

Q. You went in? A. Yes.

Q. You argued and then you picked up the board and hit him how many times? A. Once.

Q. You struck him once? A. Yes (Next portion inaudible.)

nating himself is irrelevant because their presence was unknown to petitioner. The conclusion that petitioner was not subjected to custodial interrogation is consistent with the holdings of other cases involving the use of secret agents to obtain incriminating statements. *See* United States v. Viviano, 437 F.2d 295, 300–301 (2d Cir.), cert. denied, 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971); United States v. DiLorenzo, 429 F.2d 216, 219 (2d Cir. 1970), cert. denied, 402 U.S. 950, 91 S.Ct. 1609, 29 L. Ed.2d 120 (1971); United States v. Knohl, 379 F.2d 427, 442 (2d Cir.), cert. denied, 389 U.S. 973, 88 S.Ct. 472, 19 L. Ed.2d 465 (1967).

■ Petitioner's final fifth amendment claim is that his second confession was involuntarily given. As was noted in Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), a confession is not deemed to be voluntary merely because it represents a conscious choice among alternatives. On the other hand, it cannot be said that a statement is voluntary only if it would have been made even if no inquiry or other action by law enforcement officials had occurred. Rather, a "confession is voluntary if it is the product of an essentially free and unconstrained choice and involuntary if the product of a will overborne." Mancusi v. United States ex rel. Clayton, 454 F.2d 454, 456 (2d Cir.), cert. denied sub nom., Montanye v. Clayton, 406 U.S. 977, 92 S.Ct. 2413, 32 L.Ed.2d 677 (1972), citing Lynumn v. Illinois, 372 U.S. 528, 534, 83 S. Ct. 917, 9 L.Ed.2d 922 (1963), and Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961). In short, the test of voluntariness is whether "under the totality of circumstances such pressure was exerted upon the suspect through threats, infliction of fear or pain or making of inducements and promises that his will was overborne." United States ex rel. Liss v. Mancusi, 427 F.2d 225, 229 (2d Cir. 1970), citing Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963).

■ Applying the foregoing tests, the court does not believe that petitioner's second confession was the product of a will overborne and hence involuntary. There is no doubt that Bewick deceived petitioner by concealing his newly acquired status as a police agent and denying that their conversation was being recorded. Nevertheless "[a] mere deception by an interrogator, *ipso facto*, does not invalidate a confession absent other compelling circumstances." United States ex rel. Lathan v. Deegan, 450 P.2d 181, 186 (2d Cir. 1971), cert. denied sub nom., Lathan v. Deegan, 405 U.S. 1071, 92 S.Ct. 1520, 31 L.Ed.2d 803 (1972). Petitioner's case does not present other circumstances sufficiently coercive to render petitioner's confession involuntary. As previously noted, petitioner was not in custody. Furthermore, the fact that his conversation with Bewick was surreptitiously listened to and recorded by police officers "did not tend to show either actual coercion or a potentially coercive setting." Procunier v. Atchley, 400 U.S. 446, 454, 91 S.Ct. 485, 489, 27 L.Ed.2d 524 (1971). Most significantly, Bewick did not make any threats or promises to petitioner to induce him to confess. *Compare* United States ex rel. Everett v. Murphy, 329 F. 2d 68, 70 (2d Cir.), cert. denied Murphy v. Everett, 377 U.S. 967, 84 S.Ct. 1648, 12 L.Ed.2d 737 (1964) (promise of police assistance to reduce charges). While the taking of a polygraph test might be a trying experience for any person, let alone one described as "very immature" and "very dull", it is not an event sufficient in and of itself to render involuntary a confession made during the test. *See* United States v. McDevitt, 328 F.2d 282, 284 (6th Cir. 1964); Weston v. Henderson, 279 F. Supp. 862, 864 (E.D.Tenn.1967), vacated on other grounds, 415 F.2d 343 (6th Cir. 1969). This is particularly true in petitioner's case because he had taken another polygraph test just a few days before the one in question.

■ Finally, petitioner claims that the use by the police of an eavesdrop-

ping device concealed on Bewick's person to listen to his conversation with petitioner constituted an unreasonable search and seizure under the fourth amendment. Because the electronic surveillance in petitioner's case occurred prior to the date upon which Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), was decided, it is clear that the legality of the surveillance must be determined in light of the law as it stood prior to the decision in *Katz. See* United States v. White, 401 U.S. 745, 754, 755, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971).[3]

Under pre-*Katz* law, the protections of the fourth amendment were not triggered when the use of an eavesdropping device was not accompanied by a trespass upon the premises in which the overheard conversation occurred. *See* Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 86 L.Ed. 1322 (1942); Olmstead v. United States, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). Thus in On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), rejecting the contention that a trespass by fraud had occurred when a secret agent on whose person was concealed a radio transmitter went upon the premises of the defendant and elicited incriminating statements from him, the Supreme Court held that the fourth amendment was not violated when the eavesdropping officers testified at trial about the statements. *Accord,* Lopez v. United States, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) (secret agent testified at trial).[4] Petitioner's case involved no violation of the fourth amendment: his conversation with Bewick did not take place on premises occupied by petitioner and, even if it had, no trespass would have occurred.

Petitioner seeks to distinguish *On Lee,* however, on the ground that the statements of the defendant there were freely given—he "was talking confidentially and indiscreetly with one he trusted," 343 U.S. at 753–754, 72 S.Ct. at 972—while petitioner's statements were involuntary. This argument merely raises under another guise the third fifth amendment claim rejected above and must be rejected also. *Compare* Procunier v. Atchley, *supra, with* Miller v. California, 392 U.S. 616, 88 S.Ct.

---

3. The only point upon which a majority of the Supreme Court argued in *White* was that the decision in *Katz* had been improperly applied to electronic surveillance occurring prior to the date upon which *Katz* was decided. Four Justices expressed the view, however, that *Katz* had not undermined the holding of On Lee v. United States, 343 U.S. 747, 72 S.Ct. 967, 96 L.Ed. 1270 (1952), that eavesdropping on a conversation with the connivance of one of the parties did not amount to an unreasonable search and seizure, *See* 401 U.S. at 748–754, 91 S.Ct. 1122, a view which is the law in this circuit. *See* United States v. Greenberg, 445 F.2d 1158, 1163 (2d Cir. 1971); United States v. Viviano, 437 F.2d 295, 300–301 (2d Cir.), cert. denied, 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971); United States v. DeLutro, 435 F.2d 255, 257 (2d Cir. 1970), cert. denied, 402 U.S. 983, 91 S.Ct. 1658, 29 L.Ed.2d 148 (1971); United States v. Jacobs, 431 F.2d 754, 763 (2d Cir. 1970), cert. denied, 402 U.S. 924, 91 S.Ct. 1366, 28 L.Ed.2d 665 (1971); United States v. DiLorenzo, 429 F.2d 216, 219 (2d Cir. 1970),

cert. denied, 402 U.S. 950, 91 S.Ct. 1609, 29 L.Ed.2d 120 (1971); United States v. Campbell, 426 F.2d 547, 553 (2d Cir. 1970); United States v. Kelly, 420 F.2d 26, 29 n. 1 (2d Cir. 1969); United States v. Polansky, 418 F.2d 444, 447–448 (2d Cir. 1969); United States v. Kaufer, 406 F.2d 550, 551–552 (2d Cir.), aff'd, 394 U.S. 458, 89 S.Ct. 1223, 22 L.Ed.2d 414 (1969). Thus, in this circuit at least, post-*Katz* law relating to the use of transmitting devices carried by secret agents is the same as pre-*Katz* law.

4. A third case involving a secret agent carrying a transmitter is Osborn v. United States, 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966), in which the surveillance was conducted pursuant to a court order. Apparently the surveillance in petitioner's case was conducted under a court order, but the facts relating to the order do not appear in the record. In view of the disposition made of petitioner's fourth amendment claim, however, it is not necessary to determine these facts and to consider the applicability of *Osborn* to them.

2258, 20 L.Ed.2d 1332 (1968) (dissenting opinion).

Under the New York procedure pursuant to which petitioner is permitted to raise constitutional issues in the state appellate courts and in the federal courts, notwithstanding his entry of a plea of guilty, the reviewing courts are deprived of a record indicating the proof which would have been presented at trial. If one assumes that the evidence presented to the grand jury was the evidence that would have been presented at a trial, this court would be inclined to find harmless error in the use of petitioner's second confession even if it were to be found to have been obtained in violation of the fourth or fifth amendment. *See* Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L. Ed.2d 284 (1969); Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed. 2d 705 (1967). Petitioner's first unrecorded confession as testified to by Bewick established his guilt of the crime against Charles Reynolds. Furthermore, members of petitioner's family testified that he had been seen with Reynolds the night before the latter's death. *Compare* Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972); United States v. Crisp, 435 F.2d 354, 361 (7th Cir. 1970), cert. denied, 402 U. S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); United States ex rel. Moore v. Follette, 425 F.2d 925 (2d Cir.), cert. denied sub nom., Moore v. Follette, 398 U.S. 966, 90 S.Ct. 2180, 26 L.Ed.2d 550 (1970).

The petition for a writ of habeas corpus is denied.

Certificate of probable cause and permission to appeal in forma pauperis are granted. Petitioner may file a notice of appeal with the Clerk of the United States District Court, United States Court House, Buffalo, New York, without the payment of filing fees.

So Ordered.