UNITED STATES of America,
Plaintiff–Appellee,

v.

Kenneth M. BAKER, Defendant–
Appellant.

UNITED STATES of America,
Plaintiff–Appellee,

v.

Ralph HALE, Defendant–Appellant.

UNITED STATES of America,
Plaintiff–Appellant,

v.

Kenneth BAKER; Ralph Hale,
Defendants–Appellees.

Nos. 94–30125, 94–30138 and 94–30144.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted May 5, 1995.

Decided Aug. 21, 1995.

As Amended on Denial of Rehearing and Rejection of Suggestions for Rehearing En Banc Oct. 6, 1995.*

* Judge Thompson also voted to deny the suggestions for rehearing en banc, and Judges Wright and Ferguson so recommend.

Douglas Anderson, Missoula, MT, for defendant-appellant-cross-appellee Baker.

Douglas D. Sulkosky, Tacoma, WA, for defendant-appellant-cross-appellee Hale.

Chris A. McLean, Asst. U.S. Atty., Helena, MT, for plaintiff-appellee-cross-appellant U.S.

Ronald B. MacDonald, Datsopoulos, MacDonald & Lind, Missoula, MT, for amicus curiae Feist.

Keith R. Strong, Great Falls, MT, for amicus curiae Dorothy Clinkenbeard.

Michael J. Sherwood, Missoula, MT, for amicus curiae Larry Clinkenbeard.

Before: WRIGHT, FERGUSON and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Appellants Kenneth M. Baker and Ralph Hale (defendants) were convicted in federal district court of one count each of conspiring to traffic in contraband cigarettes, in violation of 18 U.S.C. § 2342 and 18 U.S.C. § 371; two counts each of trafficking in contraband cigarettes, in violation of 18 U.S.C. § 2342(a); one count each of conspiring to commit racketeering activity, in violation of 18 U.S.C. § 1962(d); one count each of committing racketeering activity, in violation of 18 U.S.C. § 1962(c); and 671 and 218 counts, respectively, of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i).

The defendants appeal their convictions and sentences. They contend that: (1) the Contraband Cigarette Trafficking Act (CCTA), 18 U.S.C. § 2341 et seq., is not applicable to Indian traders; (2) even if the CCTA is applicable, the Act does not prohibit the activities for which they were prosecuted; (3) Washington's cigarette tax scheme—on which their CCTA violation was predicated—is invalid as applied to Indians because it (a) impermissibly intrudes upon rights of Indian sovereignty, (b) is preempted by the Indian Trader Statutes and (c) violates the Equal Protection Clause; (4) the government failed to prove the *mens rea* element required for conviction of violating the CCTA, conspiring to traffic in contraband cigarettes, and conspiring to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d); (5) they were impermissibly prosecuted for multiplicitous conspiracy counts; (6) there was insufficient evidence to convict them of the charged crimes; (7) the tolling provision of the Speedy Trial Act, 18 U.S.C. § 3161(h), which the district court applied in this case, violates the Sixth Amendment speedy trial guarantee; (8) the district court improperly informed the jury of the potential for appeal; (9) the district court improperly denied their requests for a "good faith" instruction and related request for

subpoenas; (10) the district court improperly refused to give proposed jury instructions; (11) the district court wrongfully denied Hale's motion for arrest of judgment and a new trial; and (12) the government engaged in sentencing manipulation.

The government cross-appeals, challenging the defendants' sentences. It argues the district court erred in calculating the defendants' base offense levels under the Sentencing Guidelines.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the defendants' convictions and sentences in their entirety.

## FACTUAL BACKGROUND

On October 22, 1992, a grand jury returned a 2,836–count indictment charging 23 alleged coconspirators, among them the defendants Baker and Hale, with forming an enterprise for the purpose of smuggling contraband cigarettes from the State of Montana to the State of Washington, and with committing the substantive offenses of trafficking in contraband cigarettes and laundering the proceeds of contraband cigarette sales.

The indictment was based on the following facts: Stan Feist is the owner of Feist and Watson Enterprises, Inc., d/b/a Sheehan–Majestic, a Montana corporation engaged in the wholesale distribution of cigarettes, candy and specialty foods. Dorothy Clinkenbeard is an enrolled member of the Confederated Salish and Kootenai Indian Tribes, and she holds a wholesaler's license issued by that tribe. Together with her husband Larry Clinkenbeard, Dorothy co-owns the Busted Ass Ranch in Arlee, Montana. Dorothy also owns various other businesses located on the Flathead Indian Reservation in Montana, one of which is Joe's Smoke Ring—a gas station, casino and convenience store.

The State of Montana permits wholesalers to sell tax exempt, unstamped cigarettes in unlimited quantities to Indians living on Indian reservations located within the state. In the early 1980s, Feist entered into an agreement with the Clinkenbeards to be their supplier of unstamped cigarettes.

Pursuant to the arrangement between Feist and the Clinkenbeards, Sheehan Majestic, beginning in mid–1982 and continuing until November 24, 1991, sold unstamped cigarettes to Joe's Smoke Ring in Montana. The unstamped cigarettes obtained from Sheehan Majestic were then transferred from Joe's Smoke Ring to the Busted Ass Ranch in Montana. From the Busted Ass Ranch, the cigarettes were transported by employees of the Clinkenbeards to various prearranged locations in Idaho. There, representatives of various retail smokeshops, all located on Indian reservations in Washington, took possession of the cigarettes and transported them to their Washington destinations.

Washington law provides that all cigarette packages possessed in that state must bear applicable stamps as proof of tax payment. Wash.Rev.Code § 82.24.030. Although Indians are permitted to buy unstamped, tax-exempt cigarettes on Indian reservations located within the State of Washington, all deliveries of unstamped cigarettes to Indian reservations in Washington must be preapproved by the state's Department of Revenue. Wash.Amin.Code § 458.20.192. Unapproved cigarettes are considered contraband. Wash.Admin.Code § 458.20.192. None of the parties involved in the transactions relevant to this case obtained preapproval for bringing any unstamped cigarettes into the State of Washington.

Defendant Baker is an enrolled member of the Shoalwater Indian Tribe. He manages a retail smokeshop, The Shoppe, on the Puyallup Indian Reservation near Tacoma, Washington. Defendant Hale manages a smokeshop known as the Indian Trading Post, which is also located on the Puyallup reservation. Although Hale is not a Native–American, the owner of the Indian Trading Post, Jody Satiacum, is an enrolled member of the Puyallup Tribe and her business is licensed by that tribe.[1] From the mid–1980s until

---

1. At oral argument, there was some disagreement as to whether Hale's non-Indian ethnicity is relevant to this appeal in light of the fact that Satiacum, the owner of the smokeshop Hale managed, is an enrolled Indian tribal member. Because we hold Indians are not exempt from the CCTA and Washington's cigarette tax scheme

November 1991, Baker and Hale regularly bought unstamped cigarettes from the Clinkenbeards and transported the cigarettes, without obtaining preapproval, into the State of Washington.

Baker and Hale were indicted along with Feist, the Clinkenbeards and the other alleged coconspirators. The indictment charged various counts of trafficking in contraband cigarettes, RICO violations, conspiracy to violate RICO, conspiracy to traffic in contraband cigarettes, and money laundering. Some of the coconspirators were granted changes of venue and their cases were severed.[2] Feist and the Clinkenbeards pleaded guilty to one count of conspiracy to violate RICO.[3] Charges against other coconspirators were dismissed pursuant to the plea agreements. Baker and Hale went to trial and were convicted on all counts. This appeal followed.

## DISCUSSION

1. Applicability of the CCTA to Indian Tribal Members

■ The defendants first contend that the CCTA does not apply to Indians. Because all the charges against the defendants depend on a predicate violation of the CCTA, their convictions must be reversed on all counts if in fact Indians are exempt from the provisions of the Act.

■ Whether a federal statute applies to Indians is a question of law which we review de novo. *Confederated Tribes of Warm Springs Reservation v. Kurtz,* 691 F.2d 878, 880 (9th Cir.1982), *cert. denied,* 460 U.S. 1040, 103 S.Ct. 1433, 75 L.Ed.2d 792 (1983).

The CCTA makes it "unlawful for any person knowingly to ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes." 18 U.S.C. § 2342. For purposes of the Act, contraband cigarettes are defined as "a quantity in excess of 60,000 cigarettes, which bear no evidence of payment of applicable State cigarette taxes in the State where such cigarettes are found." 18 U.S.C. § 2341(2). The Act excludes from this definition cigarettes which are in the possession of certain specifically identified categories of individuals.[4] Indians are not among the specifically exempted categories. Nonetheless, the defendants argue Congress did not intend the provisions of the Act to apply to Indians.[5] We reject this argument.

■ Federal laws of general applicability are presumed to apply with equal force to Indians. *United States v. Farris,* 624 F.2d 890, 893 (9th Cir.1980), *cert. denied sub nom, Baker v. United States,* 449 U.S. 1111, 101 S.Ct. 919, 920, 66 L.Ed.2d 839 (1981). *See also United States Dep't of Labor v. OSHRC,* 935 F.2d 182, 184 (9th Cir.1991) (quoting *FPC v. Tuscarora Indian Nation,* 362 U.S.

---

is valid as applied to Indians, Hale's and Satiacum's ethnicities are irrelevant to Hale's appeal.

**2.** Charges against some of the severed coconspirators were subsequently dismissed. *United States v. Brigman,* 874 F.Supp. 1125 (E.D.Wash. 1994). Trial of one coconspirator is still pending.

**3.** The plea agreements provide that, if any other codefendant is successful in overturning on appeal the district court's determinations that (1) the CCTA applies to Indians and (2) conviction under the CCTA does not require proof of specific intent to violate the law, Feist and the Clinkenbeards can withdraw their guilty pleas and continue to contest the charges against them. For this reason, Feist and the Clinkenbeards have filed amici briefs in this case and were permitted to participate in oral argument.

**4.** The exempted categories include (1) manufacturers and exporters of tobacco products; (2)

common or contract carriers transporting the cigarettes under a proper bill of lading; (3) persons authorized by the state in which the cigarettes are found to account for and pay cigarettes taxes, and who have complied with all accounting and payment requirements; and (4) government agents or instrumentalities having possession of the cigarettes in connection with the performance of official duties. 18 U.S.C. § 2341(2)(A)–(D).

**5.** The defendants also argue the CCTA does not apply to Indians because, in *Oklahoma Tax Comm'n v. Potawatomi Indian Tribe,* 498 U.S. 505, 514–15, 111 S.Ct. 905, 912, 112 L.Ed.2d 1112 (1991), the Supreme Court listed the options available to states wishing to collect cigarette taxes from transactions conducted on Indian reservations. Although the CCTA was in effect at the time, the Court did not include prosecution under this Act as one of the options. We are not persuaded by this argument. Nothing in *Potawatomi* indicates the Supreme Court intended its list of options to be exhaustive.

99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584 (1960)). There are only three exceptions to this general principle:

> A federal statute of general applicability that is silent on the issue of applicability to Indian tribes will not apply to them if: (1) the law touches "exclusive rights of self-governance in purely intramural matters;" (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties;" or (3) there is proof "by legislative history or some other means that Congress intended [the law] not to apply to Indians on their reservations."

*Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d 1113, 1115 (9th Cir.1985) (quoting *United States v. Farris,* 624 F.2d at 893).

The defendants do not contend the CCTA touches exclusive rights of tribal self-governance. They argue, however, that the treaty rights exception applies to the CCTA. They point out that the only restriction on the Puyallup Tribe's trading activities imposed by the Medicine Creek Treaty of 1854 appears in Article 12 of the Treaty, which provides: "The said tribes and bands finally agree not to trade at Vancouver's Island, or elsewhere out of the dominions of the United States." Medicine Creek Treaty, 10 Stat. 1132 (1854). The defendants argue the parties to the Treaty intended no other restrictions on Indian trade.

■ Even assuming the defendants are correct about the expectations of the signers of the Medicine Creek Treaty,[6] the CCTA is not an impermissible restriction on a trading right guaranteed by the Treaty. In *Dillon v. United States,* 792 F.2d 849, 853 (9th Cir. 1986), *cert. denied sub nom. Cross v. United States,* 480 U.S. 930, 107 S.Ct. 1565, 94 L.Ed.2d 757 (1987), we held that imposition of a federal income tax on Indian smokeshop income did not violate Article 12 of the Medicine Creek Treaty. We reasoned the tax was "not a burden on a treaty-protected right, but upon the income earned through the exercise of that right." *Id.* Similarly, the CCTA does not restrict trading in cigarettes;

it makes it a crime to fail to pay applicable state taxes on cigarettes subject to tax.

The defendants and amici curiae argue at length that the legislative history of the CCTA evinces Congress' intent to exempt Indians from the scope of the Act. In support of this contention, they argue language in both the Senate and House Conference Reports indicates that the CCTA was intended to assist the states in curbing the large-scale smuggling of contraband cigarettes by organized crime groups, not the untaxed cigarette trafficking conducted by Indian traders.

The legislative history of the CCTA does indicate Congress was primarily concerned with large-scale cigarette bootlegging and the involvement of organized crime. *See* S.Rep. No. 962, 95th Cong., 2d Sess. 1, 9, *reprinted in* 1978 U.S.Code and Cong.Admin.News 5518, 5523 ("The interstate aspect of the problem lends itself to a joint Federal–State interdiction effort which is focused upon the major violators and the organized crime groups."). Congress chose to deal with this concern by defining "contraband cigarettes" as "a quantity in excess of 60,-000." *See* S.Rep. No. 962 at 16 (explaining the rationale for the 60,000 figure). It could have, but did not, specifically exempt Indians from the provisions of the Act. *See also United States v. Roselli,* 432 F.2d 879, 885–86 (9th Cir.1970) (finding that, although by enacting 18 U.S.C. § 1952 Congress primarily intended to strike at organized crime, it did not restrict the statute's prohibitions to members of organized crime groups; rather, it stated the limitation in general terms applicable to organized crime, but not confined to it).

The defendants and amici curiae place great emphasis on the following footnote in House Conference Report No. 95–1778:

> Some concern was expressed in the course of the conference that the definition of "contraband cigarettes" inadvertently extinguished rights of certain Indians and Indian tribes under current law to engage

6. This assumption is not necessarily correct. In *Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), the Supreme Court found

that similar treaties with other tribes did not prevent the states from imposing limited burdens on Indians for purposes of collecting lawful taxes

in the commercial sale of cigarettes within Indian country free of State taxation. The phrase "applicable State cigarette taxes" makes it clear that this legislation is not intended to affect transportation or sale by Indians or Indian tribes acting in accordance with legally established rights.

The conferees do not intend that this bill address the current exemption from state taxation of cigarette sales on Indian reservations and nothing in this bill is intended to affect this or any other immunity from state tax held by any Indian or Indian tribe.

H.R.Conf.Rep. No. 1778, 95th Cong., 2d Sess. 1, 9 n. 1, *reprinted in* 1978 U.S.Code and Cong.Admin.News 5535, 5538.

■ We do not interpret this footnote as evidence of congressional intent to create an additional category of persons exempt from the CCTA. *But see United States v. Brigman*, 874 F.Supp. 1125, 1131 (E.D.Wash. 1994) (relying on this footnote in dismissing the charges against some of the severed co-conspirators). A fair reading of the footnote indicates Congress merely intended not to preempt rights granted to Indians by the states to transport and distribute untaxed cigarettes.[7] It accomplished this goal by using the phrase "applicable State cigarette taxes" in the statute. Thus, to the extent the states exempt Indians from having to pay cigarette taxes, so does the CCTA.

## 2. Defendants' Violation of the CCTA

■ The defendants next argue that, even if the CCTA is applicable to Indians, the Act does not criminalize the activities for which they were prosecuted.

As stated above, the CCTA prohibits shipping, transporting, receiving, possessing, selling, distributing or purchasing contraband cigarettes. The Act defines contraband cigarettes as a quantity in excess of 60,000 ciga-

rettes which do not bear evidence of payment of applicable state taxes in the state in which they are found. 18 U.S.C. §§ 2341–2342. Therefore, a violation of the CCTA requires, as a predicate, the failure to comply with state tax laws.

The State of Washington imposes an excise tax on cigarettes sold, used, consumed, handled, possessed or distributed within its borders. Wash.Rev.Code § 82.24.020 (1995). Washington collects this tax through the sale of cigarette stamps, which must be affixed to all packages of cigarettes possessed within the state which have not been preapproved for tax exemption. Wash.Rev.Code § 82.24.030. Packages of cigarettes not bearing tax stamps and not preapproved are contraband under Washington law. Wash. Rev.Code § 82.24.130(1)(a).

Indian tribal members are permitted to buy tax-free, unstamped cigarettes on Indian reservations located within the State of Washington. Wash.Admin.Code § 458–20–192 (1980). However, to ensure only Indians take advantage of this tax exemption, Washington limits the quantity of unstamped cigarettes that may be delivered to the reservations. Wash.Admin.Code § 458–20–192. This quantity is determined by the "probable demand of qualified purchasers." Wash.Admin.Code § 458–20–192. Probable demand, in turn, is calculated in either of two ways. Vendors may submit statistical evidence concerning tribal demand for cigarettes. Wash.Admin.Code § 458–20–192. Alternatively, in the absence of such evidence, the Department of Revenue fixes the untaxed cigarette quota for a tribe by multiplying the tribal population by the national average cigarette consumption per capita. Wash.Admin.Code § 458–20–192.

Any unstamped cigarettes brought into Washington for purposes of sale to Indians must be preapproved by the state's Depart-

from non-Indians. *Id.* at 156, 100 S.Ct. at 2082–83.

7. The Clinkenbeards argue that, even if the footnote is not construed to completely exempt Indians from the strictures of the CCTA, it still exempts them from prosecution for activities that were legal in 1978, when the CCTA was enacted. In 1978, they contend, "the combined effect of statutory and case law in Montana, Idaho, and

Washington legalized the activities" for which they were prosecuted. We are not persuaded by this argument. Nothing in the language of the CCTA or its legislative history indicates Congress intended the statute to be frozen in time. To the contrary, Congress' concern with helping the states control cigarette smuggling, and its use of the phrase "applicable State cigarette taxes," reflects an intention that the acts prohibited by the CCTA change as a function of evolving state law.

ment of Revenue, which ensures the cigarettes are within the reservation's allotment.[8] Wash.Admin.Code § 458–20–192. Unapproved, unstamped cigarettes destined for sale to reservation Indians are contraband. Wash.Admin.Code § 458–20–192.

The defendants do not dispute they transported into Washington unstamped cigarettes which were not preapproved by the State's Department of Revenue. Therefore, their activities violated Washington law.[9] Because the quantity of cigarettes transported by the defendants exceeded 60,000, their activities also violated the CCTA.

The defendants' arguments to the contrary are without merit. Baker contends that because Indians are permitted to possess unstamped cigarettes and to distribute them to other Indians, Washington law is violated only upon sale of the unstamped cigarettes to a nontribal member. Because there is no proof he engaged in a single transaction with a nontribal member which involved a quantity of cigarettes in excess of 60,000, he contends the CCTA is not implicated. Similarly, Hale contends the indictment does not charge the cigarettes he transported exceeded the quota allotted to the Puyallup Tribe.

In making these arguments, the defendants misapprehend Washington law. Under Washington law, mere possession of unstamped cigarettes, even by an Indian, is prohibited if the cigarettes are not preapproved for tax exemption. Unapproved cigarettes are contraband whether or not the tribe's annual allotment of unstamped cigarettes has been exhausted. The whole purpose of the preapproval requirement is to monitor the amount of unstamped cigarettes brought into the reservation to ensure that amount does not exceed the tribe's annual quota.

The defendants also argue House Bill 1359, which was recently passed by the Washington legislature, supports their contention that at the time their alleged CCTA violation occurred, Washington law did not prohibit the activities for which they were prosecuted.

House Bill 1359 is an amendment to Washington Revised Code §§ 82.24, et seq. As amended, the statute clearly provides that Indians selling cigarettes to other Indians on reservation land are exempt from the tax, but are still required to obtain preapproval for any unstamped cigarettes and to precollect the tax from any non-Indian consumers. The defendants argue the amendment indicates that prior to its effective date, July 1, 1995, no Washington law regulated tribal Indians' on-reservation possession, sale, and distribution of unstamped, unapproved cigarettes. We disagree.

"[A]n amendment to a statute does not necessarily indicate that the unamended statute meant the opposite." *Hawkins v. United States*, 30 F.3d 1077, 1082 (9th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2576, 132 L.Ed.2d 827 (1995). A state legislature "may amend a statute simply to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases." *Id.* In this case, the legislative history of House Bill 1359 indicates the Washington legislature was motivated by all these objectives when it passed the Bill. The Report accompanying the Bill explains that, in 1991, a federal district court dismissed an indictment charging four Indian retailers with violating the CCTA by possessing unstamped cigarettes in the State of Washington without obtaining advance approval from the Department of Revenue. The Report goes on to explain the court's decision was based on its belief that "Washington law does not prohibit an Indian retailer from acquiring cigarettes from an

---

**8.** There was some dispute at oral argument over the effective date of Washington's preapproval requirement. The requirement came into effect in 1980, before the defendants engaged in the activities at issue in this case. *See* Wash.Admin.Code § 458–20–192 (1980).

**9.** We disagree with *United States v. Brigman*, 874 F.Supp. at 1128–1131, which concluded that the severed codefendants, who engaged in the same activities as the defendants in this case, did not violate Washington law. *Brigman* is correct that

under Washington law, "tribal Indians are entitled to have unstamped cigarettes in their possession for consumption by and resale to reservation Indians." *Id.* at 1130. The defendants and the severed codefendants violated the law, however, by not obtaining preapproval for their unstamped cigarettes. *Brigman* did not consider the preapproval requirement, perhaps because the government in that case conceded "there is no [Revised Code of Washington] or [Washington Administrative Code] provision prohibiting Indians from buying unstamped cigarettes out of

out-of-state source and holding them without stamps, and without Department of Revenue approval, until sold to non-Indians." The Report then clarifies that, under Washington law, "[a] person may import unstamped cigarettes into th[e] state only after notifying the Department of Revenue in advance."

Finally, the defendants contend that even if Washington's preapproval requirement was technically on the books at the time of their alleged CCTA violation, the Court of Appeals of Washington effectively wrote that requirement out of the law in *Gord v. Department of Revenue*, 50 Wash.App. 646, 749 P.2d 678 (1987)—a civil forfeiture case to which Defendant Baker was a party. They point to language in *Gord* stating that "Baker would be exempted from affixing stamps to cigarettes ... if the record revealed that the cigarettes he possessed were for sales to 'established governing bodies' of an Indian tribe."[10] *Id.* 749 P.2d at 683. Based on this language, the defendants argue the Washington Supreme Court construed the law at issue as not including a preapproval requirement, and they submit we are required to abide by that court's interpretation of the law.[11]

Contrary to the defendants' contention, the Washington Supreme Court did not hold in *Gord* that Washington law permits Indians to possess unstamped, unapproved cigarettes if those cigarettes are intended for sale to other Indians on reservation lands. Rather, the court explicitly recognized that Washington Administrative Code § 458–20–192 "require[d] Indian vendors ... to seek the advance approval of the Department" of Reve-

nue before importing unstamped cigarettes into the State. *Id.*

In *Gord*, as is true here of both defendants, Baker failed to comply with this pre-approval requirement. *Id.* It was this omission on Baker's part, not merely the absence of evidence in the record establishing that the unstamped cigarettes were sold exclusively to other Indians, which in *Gord* made Baker subject to forfeiture of his pickup, trailer, and the unstamped cigarettes found within those vehicles. *Id.* The defendants' contention that *Gord* wrote the preapproval requirement out of Washington law is simply incorrect.

We conclude, based on a fair reading of the statutes and their interpretation by the Washington courts, that at the time the defendants were involved in trafficking in unstamped, unapproved cigarettes as charged in this case, the cigarettes were contraband under Washington law. Accordingly, the defendants' conduct violated the CCTA.[12]

### 3. Validity of Washington's Cigarette Tax Scheme as Applied to Indians

The defendants next argue that even if Washington law prohibits the activities in which they engaged, the law is invalid as applied to Indians because it (a) intrudes upon rights of Indian sovereignty; (b) is preempted by federal law; and (c) violates the Equal Protection Clause of the United States Constitution. We address each of these contentions in turn.

state and bringing them into Washington." *Id.* at 1128.

**10.** We note that the record in this case, like the record in *Gord*, does *not* indicate the defendants' unstamped cigarettes were intended for sale to "established governing bodies of an Indian tribe," or even to individual members of a tribe. In fact, the jury heard evidence that unstamped cigarettes were sold at both The Shoppe and the Indian Trading Post to any customer who walked in the door, without regard to the customer's race.

**11.** The court in *Brigman* relied on *Gord* in dismissing the charges against the severed codefendants. *See United States v. Brigman*, 874 F.Supp. at 1130.

**12.** The amici curiae Feist and Clinkenbeards discuss at length the fact that they complied with all Montana reporting requirements, and that they never entered the State of Washington. This is irrelevant. As the district court held, for purposes of the CCTA, unstamped cigarettes which are illegal in Washington but legal in Montana cannot be considered contraband until they are brought into Washington. Feist and the Clinkenbeards trafficked in the cigarettes only in Montana, where the cigarettes were not contraband. Therefore, neither Feist nor the Clinkenbeards could have committed the substantive crime of trafficking in contraband cigarettes, and the district court properly dismissed that charge against them. This does not mean, however, that they cannot be guilty of the crime to which they pleaded guilty—*conspiracy* to violate RICO.

### a. Intrusion on Indian Sovereignty

■ It is undisputed that the states cannot tax cigarettes bought on Indian reservations by tribal members without impermissibly intruding upon rights of Indian sovereignty. But the right of a state to impose and enforce a tax on cigarettes sold by Indians to nontribal members is also clearly established. *Washington v. Confederated Tribes of the Colville Indian Reservation (Colville),* 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980); *Moe v. Salish & Kootenai Tribes,* 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976). Moreover, "the State may impose at least 'minimal' burdens on [Indians] to aid in enforcing and collecting the tax" from non-Indians. *Colville,* 447 U.S. at 151, 100 S.Ct. at 2080. The defendants argue Washington's cigarette tax scheme unduly burdens Indian sovereignty because it requires tax stamps to be affixed to all cigarette packages, whether destined for sale to Indians or non-Indians, if those cigarettes are not preapproved. We disagree.

In *Colville,* the Supreme Court approved Washington's previous cigarette tax scheme as a permissible, minor burden on Indians. At the time *Colville* was decided, Washington law required that cigarettes held for sale on Indian reservations bear proof of tax payment in the form of stamps only if destined for sale to non-Indians. *Colville,* 447 U.S. at 141–42, 100 S.Ct. at 2074–75. The Court held that, as long as the legal incidence of the tax fell upon nontribal members, the state could require tribal smokeshops to affix tax stamps to individual packages of cigarettes prior to the time of sale. *Id.* at 159, 100 S.Ct. at 2084. The state also could require smokeshop operators to keep detailed records of both taxable and nontaxable transactions. *Id.* at 159–60, 100 S.Ct. at 2084–85. And, finally, if the tribes failed to fulfill their tax collection and remittance obligations, the state could seize as contraband unstamped cigarettes en route to Indian reservations from out-of-state wholesalers. *Id.* at 161–62, 100 S.Ct. at 2085–86.

The defendants contend Washington's current tax law is more burdensome than the scheme approved in the *Colville* case. On the contrary, the current scheme is *less* burdensome to Indians than it was when *Colville* was decided. As the district court found:

> Washington's entire regulatory program and its administration is now accomplished off-reservation. When selling cigarettes to a reservation retailer that are intended for nontribal members, a licensed distributor pays the state tax directly to the state. When selling cigarettes to a reservation retailer that are intended for tribal members, a licensed distributor obtains approval from the state to deliver unstamped cigarettes to the reservation.

There are no longer any record-keeping requirements imposed upon Indian retailers, nor are the retailers required to buy stamps from the state and personally affix them to packages of cigarettes bound for sale to nontribal members.[13] If Washington's tax scheme did not unduly interfere with Indian sovereignty when *Colville* was decided, it certainly does not do so now.

### b. Federal Law Preemption

■ In the alternative, the defendants contend that Washington's cigarette tax scheme is preempted by federal law—specifically, the Indian Trader Statutes, 25 U.S.C. § 261, et seq.[14] This argument is foreclosed by the Supreme Court's decision in *Dep't of Taxation and Finance of New York v. Milhelm Attea & Bros., Inc.,* —— U.S. ——, 114 S.Ct. 2028, 129 L.Ed.2d 52 (1994).

> The Commissioner of Indian Affairs shall have the sole power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians.
>
> 25 U.S.C. § 261 (1876).

---

**13.** The defendants' contention that the current scheme requires Indian retailers to buy all their cigarettes from in-state wholesalers is erroneous. Washington merely requires wholesalers, whether located within or without the state, to buy stamps from the state and affix them to all unapproved cigarette packages prior to distribution within the state.

**14.** The Indian Trader Statutes provide, in relevant part:

In *Milhelm Attea,* the Supreme Court held that New York's cigarette tax scheme, which is substantially similar to the Washington scheme at issue in this case, was not preempted by the Indian Trader Statutes. The Court explained that, "[j]ust as tribal sovereignty does not completely preclude States from enlisting tribal retailers to assist enforcement of valid state taxes, the Indian Trader Statutes do not bar the States from imposing reasonable regulatory burdens upon Indian traders for the same purpose." *Milhelm Attea,* —— U.S. at ——, 114 S.Ct. at 2036. As long as the incidence of the tax ultimately falls upon non-Indians, the Court determined, the Indian Trader Statutes permit the states to require Indians to precollect it. *Id.* Moreover, the Court held New York's preapproval requirement for unstamped cigarettes delivered to Indian reservations, and its "probable demand" quota on tax-free cigarettes, did not dictate "the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." *Id.* (quoting 25 U.S.C. § 261). The same holds true for Washington's cigarette tax scheme.

The defendants' attempt to distinguish *Milhelm Attea* is unconvincing. They contend that, whereas in *Milhelm Attea* the wholesalers—who were not Indians—were required to prepay state taxes on cigarettes distributed to Indian retailers for purposes of sale to non-Indians, in this case the prepayment requirement falls directly upon the Indian retailers.

This argument misconstrues the nature of the statutory scheme in *Milhelm Attea.* There, New York's scheme, like Washington's, required all wholesalers, regardless of their race, to prepay the tax on unapproved cigarettes. The tax would then be passed on to retailers, including Indian retailers, and ultimately to non-Indian consumers. Moreover, the Supreme Court's decision in *Milhelm Attea* was based on the assumption that states can validly impose a prepayment requirement directly on reservation retailers. The Court explained "[i]t would be anomalous to hold that a State could impose tax collection ... burdens on reservation retail-

ers who are themselves enrolled tribal members ... but that similar burdens could not be imposed on wholesalers, who often (as in this case) are not." *Milhelm Attea,* —— U.S. at ——, 114 S.Ct. at 2036.

*Milhelm Attea* directly controls the preemption issue in this case. Washington's cigarette tax scheme, like the New York scheme approved in *Milhelm Attea,* is not preempted by the Indian Trader Statutes by virtue of the fact that it imposes a prepayment requirement on Indian retailers.

c. Equal Protection

■■■■■ Defendant Baker argues that Washington's cigarette tax scheme violates the Equal Protection Clause. Equal protection claims are questions of law which we review de novo. *United States v. Harding,* 971 F.2d 410, 412 (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1025, 122 L.Ed.2d 170 (1993).

Washington Revised Code § 82.24.040(2) permits wholesalers licensed by the state who furnish a surety bond to the Department of Revenue to set aside a stock of unstamped cigarettes for purposes of sale to Indian tribes and federal instrumentalities. Under Washington Revised Code § 82.24.040(3), the Department of Revenue may revoke its permission to set aside unstamped cigarettes for sale to Indian tribes if "it appears that sales of unstamped cigarettes to persons who are not enrolled members of a recognized Indian tribe are taking place, or have taken place." Baker complains this provision violates equal protection because it applies only to Indian tribes and not to federal instrumentalities. He also challenges section 458–20–192 of the Washington Administrative Code on the ground that it places a burden only on Indian tribes, and not on federal instrumentalities, to obtain preapproval for the delivery of unstamped cigarettes.[15]

The district court rejected Baker's equal protection argument because, while Washington is permitted to regulate on-reservation sales of cigarettes by Indians to non-Indians, *Colville,* 447 U.S. at 160, 100 S.Ct. at 2084–

---

**15.** We note this provision actually does not burden Indian tribes at all. It requires wholesalers

selling cigarettes to Indian tribes, not the tribes themselves, to obtain preapproval.

85, the state cannot regulate cigarettes sold to federal instrumentalities unless Congress consents to the regulation. This ruling was correct. *See American Fed'n of Gov't Employees v. Federal Labor Relations Auth.*, 802 F.2d 1159, 1163 (9th Cir.1986) (citing *Hancock v. Train*, 426 U.S. 167, 178–79, 96 S.Ct. 2006, 2012–13, 48 L.Ed.2d 555 (1976) for the proposition that "[t]he federal government may control its property free from regulation by the states unless Congress declares that the property is subject to state regulation").

Baker contends that, in the same way Washington cannot tax federal instrumentalities without congressional consent, it cannot tax reservation Indians unless Congress permits it to do so. This much is correct. *See McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). Washington's tax scheme, however, does not impose any tax on reservation Indians. It merely requires Indian retailers to prepay taxes to be collected from their non-Indian consumers. This precollection requirement is a permissible, minor burden on Indian trade. *Colville*, 447 U.S. at 160, 100 S.Ct. at 2084–85.

### 4. Mens Rea

The defendants argue their convictions should be reversed because the government did not prove the requisite *mens rea* for conviction of the charged crimes. They argue conviction under the CCTA requires proof of a defendant's knowledge that his actions violated the law. They also contend that, in order to convict them of the charged conspiracy counts—conspiracy to traffic in contraband cigarettes and conspiracy to violate RICO—the government had to prove they acted with specific intent to violate the law.[16] We first consider the *mens rea* requirement of the substantive CCTA charge.

The CCTA makes it a crime for persons to "*knowingly* ... ship, transport, receive, possess, sell, distribute, or purchase contraband cigarettes." 18 U.S.C. § 2342 (emphasis added). This provision of the statute requires willfulness. It does not, however, require knowledge that the actions engaged in violate the law. "A requirement that the conduct be willful generally means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose he is breaking the law." *United States v. Scanio*, 900 F.2d 485, 489 (2d Cir.1990).

We have recognized two categories of cases as exceptions to the general rule that ignorance of the law is no excuse. *United States v. Fierros*, 692 F.2d 1291, 1294 (9th Cir.1982), *cert. denied*, 462 U.S. 1120, 103 S.Ct. 3090, 77 L.Ed.2d 1350 (1983). "The first category involves instances where the defendant is ignorant of an independently determined legal status or condition that is one of the operative facts of the crime.... In such a case, the mistake of the law is for practical purposes a mistake of fact." *Id.* The second category involves "prosecution under complex regulatory schemes that have the potential of snaring unwitting violators." *Id.* at 1295. Contrary to the defendants' contention, neither exception applies to this case.

The first exception applies only to a defendant who is reasonably mistaken as to the *factual* events which form the basis for his prosecution. *United States v. Aguilar*, 883 F.2d 662, 675 & n. 5 (9th Cir.1989), *cert. denied sub nom. Socorro Pardo v. United*

16. The defendants argue the government was required to prove their specific intent to violate *federal* law. If by this they mean to suggest they cannot be guilty of either conspiracy to violate the CCTA or conspiracy to violate RICO unless they knew their actions violated federal rather than state law, their argument is meritless. Knowledge of the federal nature of an offense is not an essential element of the crime of conspiracy to commit that offense. *See United States v. Feola*, 420 U.S. 671, 95 S.Ct. 1255, 43 L.Ed.2d 541 (1975); *United States v. Hobson*, 519 F.2d 765, 769 (9th Cir.), *cert. denied sub nom. New-man v. United States*, 423 U.S. 931, 96 S.Ct. 283, 46 L.Ed.2d 261 (1975). *United States v. Conroy*, 589 F.2d 1258 (5th Cir.1979), *cert. denied*, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979), on which the defendants rely, is not to the contrary. In that case, the Fifth Circuit held the crime of conspiracy to import a controlled substance into the United States required proof of the defendant's knowledge the substance was destined for the United States rather than some other country. *Id.* at 1270. The court did not hold that the defendant had to know his actions violated American law.

*States*, 498 U.S. 1046, 111 S.Ct. 751, 112 L.Ed.2d 771 (1991). In the present case, this exception would apply if the defendants asserted reasonable grounds to believe the tax on the cigarettes had been paid, but it does not extend to their assertion that the government was required to prove they knew a tax was due. *See United States v. Fierros*, 692 F.2d at 1294 (finding exception inapplicable where defendants contended they were unaware the law prohibited transporting and harboring illegal aliens, though it would be available if they asserted a reasonable belief the aliens were legally admitted into the United States).

Nor is the second exception applicable. The interaction between the CCTA and Washington's tax scheme, on which the CCTA violation is predicated, does not involve a complex regulatory scheme with the potential of trapping unwary merchants trading in cigarettes. The law is quite simple. All cigarettes in quantities exceeding 60,000 which are brought into the state must either be stamped or preapproved by the state's Department of Revenue. .

In analogous cases, the Supreme Court has held that, in order to convict a defendant of possessing heavily regulated articles such as firearms, corrosive liquids and drugs, the government is required to prove the defendant knew the physical nature of what he possessed, but not that he knew his possession was prohibited. *United States v. Freed*, 401 U.S. 601, 91 S.Ct. 1112, 28 L.Ed.2d 356 (1971) (firearms); *United States v. International Minerals and Chemical Corp.*, 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971) (corrosive liquids); *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943) (drugs). On the other hand, conviction for knowingly possessing or using food stamps in a manner not authorized by statute requires proof the defendant knew his possession or use was unlawful. *Liparo-*

*ta v. United States*, 471 U.S. 419, 105 S.Ct. 2084, 85 L.Ed.2d 434 (1985).

The distinction between these cases lies in the fact that, while firearms, corrosive liquids and drugs are dangerous substances that are likely to be regulated, food stamps are a benign article whose prohibited uses may be seemingly permissible. *See Liparota*, 471 U.S. at 426, 105 S.Ct. at 2088–89.

Cigarettes, at least when possessed in large quantities, are—like drugs, corrosive liquids and firearms—likely to be regulated. *United States v. Elshenawy*, 801 F.2d 856, 858–59 (6th Cir.1986), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1309, 94 L.Ed.2d 164 (1987).[17] Thus, knowledge of cigarette taxing requirements can be presumed among those who deal in cigarettes in quantities exceeding 60,000. *Id.* at 859.

The defendants argue the Supreme Court's decision in *Ratzlaf v. United States*, —— U.S. ——, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994), supports their contention that a specific intent to violate the law is an essential element of a CCTA violation. We disagree. In *Ratzlaf*, the Court held that to establish a "willful" violation of the antistructuring laws, the government must prove the defendant knew his actions were unlawful. *Id.* at ——, 114 S.Ct. at 657. The Court was "mindful of the complex of provisions in which [the laws] are embedded," *id.* at ——, 114 S.Ct. at 659, and of the fact that "currency structuring is not inevitably nefarious." *Id.* at ——, 114 S.Ct. at 660–61. *See also United States v. Weitzenhoff*, 35 F.3d 1275, 1285 (9th Cir.1993) (The *Ratzlaf* "Court recognized that the money structuring provisions are not directed at conduct which a reasonable person necessarily should know is subject to strict public regulation and that the structuring offense applied to all persons with more than $10,000, many of whom could be engaged in structuring for innocent reasons."). The Court also emphasized its intent not to "dishonor the venerable principle that ignorance

---

**17.** The defendants' attempt to distinguish *Elshenawy* is not convincing. They contend the language of the law at issue in that case was much clearer than is Washington's tax scheme and that, while Elshenawy admitted he assumed the cigarettes in his possession were subject to a tax that had not been paid, the defendants have consistently denied any such knowledge. As stated above, we believe Washington's cigarette tax law is perfectly clear. Moreover, in light of the Sixth Circuit's decision that proof of a defendant's knowledge of the law is not necessary for conviction under the CCTA, Elshenawy's admission was irrelevant to its holding in the case.

of the law generally is no defense to a criminal charge." *Ratzlaf,* ── U.S. at ──, 114 S.Ct. at 663. *See also Cheek v. United States,* 498 U.S. 192, 199–200, 111 S.Ct. 604, 609–10, 112 L.Ed.2d 617 (1991) (finding knowledge of law required for conviction of violating the federal tax code because the "complexity" of the scheme could potentially ensnare "the average citizen.").

As we said earlier, the CCTA and Washington's cigarette tax scheme are not so complex as to create the danger of innocent violation. We conclude conviction under the CCTA does not require proof that a defendant knows his conduct violates the law. We next consider the *mens rea* requirement for conviction of the conspiracy counts.

■ The defendants challenge their convictions for conspiracy to violate the CCTA and conspiracy to violate RICO by pointing out that the indictment alleged they knowingly *and willfully* conspired, confederated and agreed to form a RICO enterprise and deal in contraband cigarettes. They contend the word " 'willfully' establishes a more exacting standard than 'knowingly' and . . . connotes an act which is . . . committed with the specific intent to do . . . what a defendant knows is unlawful." Even if the word "willfully" had not been used in the indictment, they argue intent to violate the law is an essential element of the crime of conspiracy.

■ Establishing a defendant's guilt of conspiracy to commit a substantive crime requires proof of the *mens rea* essential for conviction of the substantive offense itself. *United States v. Roselli,* 432 F.2d 879 (9th Cir.1970), *cert. denied sub nom. Teitelbaum v. United States* and *Jacobs v. United States,* 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). No greater or different intent is necessary. *Id.* As we explained above, a conviction of the substantive CCTA count does not require proof of a specific intent to violate the law. Therefore, neither does a conviction for conspiring to engage in activities which violate the CCTA.

■ Similarly, a defendant can be guilty of conspiring to violate RICO if he possesses the mental state necessary for conviction of the substantive RICO offense. *See*

*Roselli,* 432 F.2d 879. The *mens rea* element necessary for a substantive RICO conviction is the same as is required for the predicate crime, in this case violation of the CCTA. *United States v. Scotto,* 641 F.2d 47, 55–56 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981). Because the CCTA does not require proof of intent to violate the law, the defendants can be guilty of conspiring to violate RICO even if they were not aware their actions were illegal.

■ The fact that the word "willfully" was used in the indictment does not change this result. As the district court held, the pertinent language in the indictment charges that the defendants "did knowingly and willfully conspire, confederate and agree to knowingly ship, transport receive, possess, and distribute contraband cigarettes." As used in the indictment, "willfully" modifies "conspire, confederate and agree," not "ship, transport, receive, possess, and distribute contraband cigarettes." Therefore, even if we were to assume the definition of "willfully" offered by the defendants is correct, it does not entitle them to the relief they seek.

The defendants' definition of "willfully," however, is not correct as applied to this case. They rely on *United States v. Lizarraga–Lizarraga,* 541 F.2d 826 (9th Cir.1976). Such reliance is misplaced. In *Lizarraga,* we interpreted the word "willfully" as used in 22 U.S.C. § 1934 to require a specific intent to violate a known legal duty. *Id.* at 828. We interpreted "willfully" in this manner because section 1934 prohibits exportation of items listed by administrative regulation, not by the statute itself; and the regulation contains an exhaustive list of items not generally known to be governmentally controlled. *Id.* Therefore, a lesser *mens rea* requirement would potentially criminalize innocent or negligent errors. *Id.* As we explained above, no similar danger exists with respect to the CCTA. *See also United States v. Scotto,* 641 F.2d at 56 (word "willfully" in RICO statute does not require specific intent to violate the terms of statute).

### 5. Multiplicitous Conspiracy Counts

■ The defendants contend the charge of conspiracy to violate RICO and the charge of conspiracy to violate the CCTA allege one and the same conspiracy, and as a result the defendants cannot be convicted and punished for both.

■ The circuits appear to be in disagreement whether a conspiracy to violate RICO and a conspiracy to commit the predicate offense on which the RICO conspiracy is based are the "same offense" under the *Blockburger* test. *Compare United States v. Kragness,* 830 F.2d 842 (8th Cir.1987) *and United States v. Johnson,* 911 F.2d 1394, 1398 (10th Cir.1990), *cert. denied,* 498 U.S. 1050, 111 S.Ct. 761, 112 L.Ed.2d 781 (1991), *with United States v. Deshaw,* 974 F.2d 667 (5th Cir.1992).[18] Whether they are or not, however, conviction and punishment for both is permissible. "[T]he Supreme Court has repeatedly emphasized that, at least in cases where cumulative punishments are imposed in a single prosecution, the *Blockburger* rule is a tool of statutory construction used to determine legislative intent rather than a constitutional 'litmus test' that imposes a conclusive presumption of law." *United States v. Kragness,* 830 F.2d at 863 (citing *Garrett v. United States,* 471 U.S. 773, 778–79, 105 S.Ct. 2407, 2411–12, 85 L.Ed.2d 764 (1985)), and *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983). Where the offenses are the same under the *Blockburger* test, multiple punishments are permitted if Congress intended that they be imposed. *Id. See also United States v. Johnson,* 911 F.2d at 1398.

"RICO's statutory language reflects congressional intent to supplement, rather than supplant, existing crimes and penalties." *United States v. Deshaw,* 974 F.2d at 671–72. The statute specifically provides that "[n]othing in [RICO] shall supersede any provision of Federal ... law imposing criminal penalties ... in addition to those provided for in [RICO]." *United States v. Kragness,* 830 F.2d at 864 (quoting Pub.L. No. 91–452, § 904(b), 84 Stat. 947). Clearly, Congress "intended to permit, and perhaps sought to encourage, the imposition of cumulative sentences for RICO offenses and the underlying crimes." *Id.*

We reject the defendants' argument that their convictions and sentences for conspiracy to violate RICO and conspiracy to violate the CCTA are precluded because they are multiplicitous.

### 6. Sufficiency of the Evidence

In reviewing the sufficiency of the evidence to support a conviction, we search the record to determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Lennick,* 18 F.3d 814, 819 (9th Cir.1994).

#### a. Money–Laundering Counts

■ Baker challenges his money-laundering convictions. He contends the government presented insufficient evidence to prove he engaged in a financial transaction "with the intent to promote the carrying on" of unlawful activity, as required by 18 U.S.C. § 1956(a)(1)(A)(i). This claim is meritless. The government presented abundant evidence of payments Baker made to the Clinkenbeards for the purchase of contraband cigarettes. Baker could not have continued the illegal trafficking without paying his cigarette suppliers. *See United States v. Montoya,* 945 F.2d 1068, 1076 (9th Cir.1991) (depositing a check in a bank account suffices to satisfy the requirements of section 1956(a)(1)(A)(i) because, without depositing the check, the defendant could not make use of the funds).

■ Baker also argues the government failed to prove he engaged in a financial

---

**18.** Our circuit has previously suggested, in affirming a defendant's convictions on both drug conspiracy and RICO conspiracy charges where the RICO conspiracy was predicated on the drug offense, that the offenses are not the same for purposes of *Blockburger. United States v. Ryland,* 806 F.2d 941, 942–43 (9th Cir.1986), *cert. denied,* 481 U.S. 1057, 107 S.Ct. 2199, 95 L.Ed.2d 854 (1987).

transaction knowing it was designed to conceal the nature or source of the funds. 18 U.S.C. § 1956(a)(1)(B)(i). We reject this argument because the government was not required to prove this fact.

The money-laundering statute provides in relevant part:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

. . . .

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; . . . .

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1).

In *United States v. Montoya*, 945 F.2d 1068, we noted that "subsections (A)(i) and (B)(i) [of the statute] are set forth in the disjunctive." *Id.* at 1076. In order to convict a defendant under subsection (A)(i), as opposed to subsection (B)(i), the government need not prove the financial transaction in which he engaged was intended to conceal, disguise or otherwise thwart detection of the source of the funds. *Id.* The indictment charged Baker with violating subsection (A)(i), not subsection (B)(i). It is therefore irrelevant that all of Baker's financial transactions were recorded in the bank, all his cigarette orders and payments were documented, and applicable income taxes were

paid on all monies generated by his retail store.

■ Finally, Baker argues the government failed to prove he knew the funds involved in the money-laundering transactions were proceeds of illegal activity.

There is no dispute that the money-laundering statute "requires the government to prove that a defendant charged with participating in the financial transaction identified in the indictment knew that it involved the proceeds of unlawful activities." *United States v. Jackson*, 935 F.2d 832, 838 (7th Cir.1991). In *United States v. Stein*, 37 F.3d 1407 (9th Cir.1994), we held that "to sustain a conviction [for money laundering] the defendant must have known that the primary predicate activity . . . was unlawful." *Id.* at 1410. What the defendant need not have known is "that the secondary act of laundering the proceeds [of the unlawful activity] was [also] unlawful." *Id.*

In this case, the primary, predicate activity was trafficking in unstamped, unapproved cigarettes. The government presented ample evidence showing Baker knew this activity was illegal.[19] The jury heard that Baker, over a ten-year period, regularly faxed coded messages to the Clinkenbeard ranch specifying the time and location of a planned meeting. He or his representative would drive an empty van to the secret meeting spot outside of the State of Washington, where they would rendezvous with a Clinkenbeard employee driving a van loaded with unstamped cigarettes. The drivers would then exchange vehicles, after which the van containing the cigarettes would be driven back to Washington and the empty van would be returned to the Clinkenbeard ranch. The vehicles involved in these exchanges had their interiors removed to permit greater storage space and their windows darkened to avoid detection of the cargo.

The evidence also showed that Baker always paid the Clinkenbeards for the unstamped cigarettes with cashier's checks payable to a company by the name of Northwest

---

19. In section (4) *supra*, we concluded only that the government was not *required*, in order to convict the defendants of violating the CCTA, to prove they knew their trafficking activities violated the law. We did not say the government in fact had not proved the defendants' knowledge of the illegality of their acts.

Display, a fireworks business owned by the Clinkenbeards. Baker instructed his employees at The Shoppe to purchase the cashier's checks in amounts not exceeding $3,000. If more than one check was required for a single cigarette purchase, Baker's employees were instructed to obtain the checks from different bank branches. Thus, for example, on January 22, 1991, Baker paid the Clinkenbeards with eight cashier's checks made out to Northwest Display, each in the amount of $2,900 and each drawn at a different branch of the same bank on the same day.

In light of all this evidence, a rational juror easily could have found Baker intended to conceal his involvement in the cigarette purchases, and that he did so because he knew the cigarettes were contraband.

### b. Other Counts

Hale asserts the government presented insufficient evidence to prove facts essential to his conviction on the remaining counts.

The government was not required to prove most of the facts upon which Hale contends it presented insufficient evidence. For example, Hale contends the government failed to prove unstamped cigarettes were sold to non-Indians at the Indian Trading Post; that state cigarette taxes were not collected from non-Indians, if in fact sales to non-Indians were made; that there was even a single transaction with a non-Indian involving a quantity of cigarettes in excess of 60,000; that the Indian Trading Post ever had a stock of cigarettes exceeding 60,000; and that the number of unstamped cigarettes delivered to the reservation exceeded the Puyallup Tribe's annual quota. As explained in the preceding sections, these facts are all irrelevant to a CCTA violation and to the other crimes charged in the indictment.

Hale further contends the government presented insufficient evidence to connect the cigarettes he bought from the Clinkenbeards to the State of Washington, or to prove he ever transported a quantity of unstamped cigarettes exceeding 60,000 into Washington in a single transaction.

There is no basis for this argument. The government presented evidence that surveil-lance by the Bureau of Alcohol, Tobacco and Firearms revealed truckloads of unstamped cigarettes were delivered to Washington in response to the telephonic orders Hale placed with the Clinkenbeards. Over a period of years, Hale, his son or his employees made twice-weekly trips to pick up anywhere from 50 to 90 cases of unstamped cigarettes and bring them into Washington. When a search warrant was executed at the Indian Trading Post in November 1991, numerous cases of unauthorized, unstamped cigarettes were found in its stock. There was ample evidence to convict Hale of all the charges against him.

### 7. Speedy Trial Violation

██ Baker argues the Speedy Trial Act, 18 U.S.C. § 3161, is unconstitutional because it tolls the speedy trial period as to each defendant whenever a codefendant files a pretrial motion. 18 U.S.C. § 3161(h). Baker contends the delay occasioned by the acts of one codefendant cannot be attributed to another without violating the Constitution's speedy trial guaranty, unless the other codefendant specifically waives his right to a speedy trial.

The district court rejected Baker's argument on the basis of *United States v. Butz,* 982 F.2d 1378 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 250, 126 L.Ed.2d 203 (1993). In *Butz,* we confirmed that, under the Speedy Trial Act, delays caused by one defendant are excluded from the speedy trial clock as to all codefendants. *Id.* at 1381. We did not consider the constitutionality of this provision of the Speedy Trial Act, as Baker asks us to do in this case.

The Speedy Trial Act requires that trial commence within 70 days of the filing of the indictment or from the date the defendant appears before a judicial officer or a court, whichever comes last. 18 U.S.C. § 3161(c)(1). No court has ever held this 70-day period is guaranteed by the Constitution.

In *United States v. Brainer,* 691 F.2d 691 (4th Cir.1982), the Fourth Circuit upheld the Speedy Trial Act against a constitutional challenge based on a separation of powers theory. In doing so, the court recognized that "the Sixth Amendment ... secures cer-

tain minimal trial rights against encroachment by government," but "[i]n no way ... prevent[s] Congress from according the accused more protection than the Constitution requires." *Id.* at 698. *Brainer* suggests the Speedy Trial Act affords greater protection to a defendant's right to a speedy trial than is guaranteed by the Sixth Amendment, and therefore a trial which complies with the Act raises a strong presumption of compliance with the Constitution. *See United States v. Fuller,* 942 F.2d 454, 457 (8th Cir.) (rejecting the defendant's Sixth Amendment speedy trial challenge because any delay was caused by his codefendants' various motions and, under the Speedy Trial Act, this time properly counts against the defendant), *cert. denied,* 502 U.S. 914, 112 S.Ct. 315, 116 L.Ed.2d 257 (1991) and 502 U.S. 1039, 112 S.Ct. 890, 116 L.Ed.2d 793 (1992).

■ The Constitution does not set a specific time period within which a trial must occur. Rather, Sixth Amendment speedy trial claims are assessed by considering a combination of factors, including: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) the prejudice to the defendant. *United States v. Baker,* 10 F.3d 1374, 1401 (9th Cir.1993) (citing *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2191–92, 33 L.Ed.2d 101 (1972)). Applying these factors, there may be some situations in which tolling the speedy trial clock due to a codefendant's actions may violate another defendant's Sixth Amendment right. But this does not render the Speedy Trial Act unconstitutional as a matter of law.

In this case, Baker has made no showing that the length of time between his initial court appearance and the commencement of trial caused him prejudice, the fourth *Baker* factor. It is unnecessary, therefore, for us to address the remaining *Baker* factors. *See United States v. Davis,* 1 F.3d 1014, 1018 (10th Cir.1993). There was no Sixth Amendment speedy trial violation.

8. District Court's Comment on Potential for Appeal

■ The defendants next argue they are entitled to reversal of their convictions be-

cause the district court told the jury the defendants could appeal an adverse verdict. They contend this diluted the jury's sense of final responsibility for the verdict.

■ Because the defendants did not object to the district court's comments, we review these comments for plain error. *United States v. Greenberg,* 445 F.2d 1158, 1162 (2d Cir.1970).

Comments by a trial court about the potential for appeal are inappropriate, but "reversal does not follow automatically merely because a trial judge succumbs to a bad idea." *United States v. Arcadipane,* 41 F.3d 1, 9 (1st Cir.1994). *See also United States v. Greenberg,* 445 F.2d at 1162 (holding that, while "[i]t might have been better procedure not to have told the jury that if they convicted upon an erroneous charge they did 'not have to worry' because [an appellate] court would reverse if there were error," reversal was not warranted on this basis). Rather, challenges to such comments are treated like all other challenges to a jury charge: "the court of appeals must examine the charge as a whole to determine if the judge balanced the instructions, correctly informed the jurors of the governing law, imbued the jurors with an appropriate sense of responsibility, and avoided undue prejudice." *United States v. Arcadipane,* 41 F.3d at 8.

Viewed in the context of this case, the trial judge's comments did not impermissibly relieve the jury of its sense of responsibility for the verdict.

At the beginning of its charge to the jury, the district court instructed as follows:

Now you are bound and obligated to follow the law as instructed by the court, and this is the way our system works. In the event that one or more of the defendants here is or are convicted in this case, that is, found guilty by the jurors, they may take an appeal to the Ninth Circuit Court and that court, being a higher and wiser court than this one, will look to see what this court's instructions to the jury were. And if those instructions are substantially erroneous, then, of course, the higher court will reverse and remand in all likelihood.

It may well be that this is a case that will go to the Supreme Court of the United States. I don't know. I've had some cases go there. This one has the potential for it.

In the event that the jury might not follow the court's instructions, then our system can't work. And so you folks have got to take the law as I give it to you, and you have to recognize that I am the judge of the law, that you are the judges of the facts.

You folks have the sole and exclusive province and duty of ascertaining and determining what the facts are. But not so, the law. That's what makes our system work.

Now, speaking of the judges of the facts, your function is to determine what the facts are....

You are the sole judges of the facts.... You should not consider any comment by the court as a comment on the credibility of a witness or the validity of any physical evidence. The question of credibility of the witnesses is entirely for you folks as the judges of the facts.

The defendants correctly cite *United States v. Fiorito*, 300 F.2d 424 (7th Cir.1962), for the proposition that "[c]omments which tend to shift the jury's final responsibility to another tribunal are inappropriate." *United States v. Grimsley*, 419 F.2d 387, 387 (5th Cir.1969). But in this case, as was the case in *Grimsley*[20] and *Arcadipane*,[21] the judge's comments were directed toward review of his own rulings, not the jury's. Moreover, the

judge informed the jurors they were the sole and final judges of the facts. *See United States v. Ferra*, 900 F.2d 1057, 1060 (7th Cir.1990).[22] In these circumstances, although discussing the appellate process with the jury may have been unwise, it was not plain error.

### 9. Request for Subpoenas and "Good Faith" Instruction

 The defendants challenge the district court's denial of their requests for subpoenas for various proposed witnesses and for payment of the witnesses' travel expenses. They also contend the district court erred in refusing to instruct the jury on the defense of good faith. These arguments are essentially a restatement of the *mens rea* argument we considered and rejected in section (4) *supra*.

The witnesses the defendants sought to have subpoenaed would have testified that the Puyallup Tribe believed the Medicine Creek Treaty precluded the state from exercising taxing authority on the reservation. As explained previously, the Tribe's mistake as to the law is not a proper defense to a CCTA violation. The district court was not required to subpoena and admit the testimony of witnesses who would have provided irrelevant evidence.

 For the same reason, the district court was not required to instruct the jury on the defendants' good faith defense. Good faith is not a defense to the charged crimes.

**20.** In *Grimsley*, the following comment by the trial court was considered insufficient grounds for reversal of the defendant's conviction:

> This young man seated over here between you and I writes down everything that I say concerning every rule and if the occasion should present itself, then the injured party would have an opportunity to have—and if it is necessary because of the nature of the verdict—some other court at some other time could review my rulings as to whether or not they were correct or not.

*United States v. Grimsley*, 419 F.2d at 387.

**21.** In *Arcadipane*, the court refused to reverse the defendant's conviction based on the following comment by the trial judge:

> You are the judges of the facts, and I will leave to you entirely the judgment of the facts.

> I ask you to leave to me entirely the judgment as to the law.
>
> You should also understand that if I am in error, there is a higher court that can and cheerfully will reverse me. However, there is no higher court that will review your judgment of the facts. You are the only, the final judges of the facts in this case.

*United States v. Arcadipane*, 41 F.3d at 8.

**22.** In *Ferra*, the following comment by the judge did not require reversal of the defendant's conviction:

> If I tell you what the law is and I tell you wrong, why, an appellate court can straighten me out, but nobody else determines what the facts are. You do that, and so it's important that you do it with devotion to the task.

900 F.2d at 1060.

The district court correctly instructed the jury on the requisite intent for conviction under the CCTA. Nothing more was required.

#### 10. Other Proposed Jury Instructions

Hale argues the district court also erred in not giving various other proposed jury instructions. The government responds that Hale did not object to the district court's failure to give these instructions, and Hale does not dispute this. Therefore, we review the court's failure to give these instructions for plain error. *United States v. Smith*, 891 F.2d 703 (9th Cir.1989); *United States v. Kessi*, 868 F.2d 1097, 1102 (9th Cir.1989).

The majority of the proposed jury instructions Hale contends the court should have given to the jury are misstatements of the law as discussed in the sections above. The instructions would have erroneously informed the jury that: the CCTA is not applicable to Indians, cigarettes in transit to Indian reservations are not subject to taxation, the Medicine Creek Treaty precludes states from imposing taxes on cigarettes traded by Indians, Washington law does not impose a tax on cigarettes until the first sale to a non-Indian, and convictions under RICO and the CCTA require proof that the defendant knew his actions violated federal law. The district court properly refused to give these instructions.

The remainder of Hale's proposed jury instructions—dealing with the burden of proof, the credibility of witnesses, and the elements of the various crimes charged in the indictment—are repetitive of instructions which the district court did give.

The district court did not err in refusing to give Hale's proposed instructions.

23. Hale argued, in addition, that based on *Ratzlaf v. United States*, which was decided after his trial, contraband cigarette trafficking should be treated as a specific intent crime. We considered and rejected this argument in section (4) *supra*.

24. Hale made no objection at trial to the instructions given to the jury.

#### 11. Motion for Arrest of Judgment or New Trial

The district court denied Hale's motion for arrest of judgment or a new trial. We review the court's decision not to grant the motion for abuse of discretion. *United States v. George*, 960 F.2d 97, 101 (9th Cir. 1992).

Hale's motion before the district court asserted a variance between the indictment and the court's instructions to the jury.[23] He argued that, while the indictment charged him with "transporting, shipping, receiving, possessing, and distributing" contraband cigarettes, the court instructed the jury it could find him guilty of violating the CCTA if it found that he "sold or purchased" the cigarettes.[24] As the district court held, this argument is specious. "Distributing" includes "selling" and "receiving" includes "purchasing." There was no variance between the indictment and the jury instructions. Hale's motion for a new trial or arrest of judgment was properly denied.

#### 12. Sentencing Manipulation

Baker argues for the first time on appeal that he is entitled to reversal of his conviction because the government improperly engaged in sentencing manipulation. He contends the government unnecessarily prolonged its investigation of the contraband cigarette trafficking scheme for the sole purpose of increasing the coconspirators' sentencing exposure. Such sentencing manipulation, he contends, is a bar to prosecution.

A district court's "determination as to whether improper [sentencing] manipulation exists is ordinarily a fact-bound determination subject to clear-error review." *United States v. Gibbens*, 25 F.3d 28, 30 (1st Cir. 1994). Because Baker did not raise this issue in the district court, however, he must demonstrate plain error.[25] Fed.R.Crim.P.

25. Baker argues he was not required to raise this issue before the district court because "the potential evil of sentencing manipulation [cannot] be gauged until the sentence has been passed." This may or may not be true, but nothing prevented Baker from raising the sentencing manipulation issue to the district court when it announced its sentence.

52(b). *See also United States v. Jones,* 18 F.3d 1145, 1152 (4th Cir.1994).

The viability of sentencing manipulation as a valid doctrine is uncertain. No court has held, however, that sentencing manipulation can serve as a complete bar to prosecution. In *United States v. Jones,* on which Baker relies, the Fourth Circuit, in suggesting outrageous government conduct can serve as a valid defense to a crime, warned that "[a]s a practical matter, only those claims alleging violation of particular constitutional guarantees are likely to succeed." *Jones,* 18 F.3d at 1154. There is no such allegation in this case.

Our circuit has held that sentencing "entrapment" may be a proper basis for a downward departure at sentencing. *United States v. Staufer,* 38 F.3d 1103, 1106 (9th Cir.1994); *United States v. Garza–Juarez,* 992 F.2d 896, 911–12 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994). "Sentencing entrapment ... occurs when 'a defendant, although predisposed to commit a minor or lesser offense, is entrapped in[to] committing a greater offense subject to greater punishment.'" *United States v. Staufer,* 38 F.3d at 1106 (quoting *United States v. Stuart,* 923 F.2d 607, 614 (8th Cir.), *cert. denied,* 499 U.S. 967, 111 S.Ct. 1599, 113 L.Ed.2d 662 (1991)).

Baker does not contend he was subjected to this form of "sentencing entrapment." He asserts only that the government stretched out its investigation after it had sufficient evidence to indict. This may be true, but we decline to adopt a rule that, in effect, would find "sentencing manipulation" whenever the government, even though it has enough evidence to indict, opts instead to wait in favor of continuing its investigation. *See Jones,* 18 F.3d at 1155.

Such a rule "would unnecessarily and unfairly restrict the discretion and judgment of investigators and prosecutors." *Id.* at 1145. "Police ... must be given leeway to probe the depth and extent of a criminal enterprise, to determine whether coconspirators exist, and to trace ... deeper into the distribution hierarchy." *United States v. Calva,* 979 F.2d 119, 123 (8th Cir.1992). *See also United States v. Shephard,* 4 F.3d 647, 649 (8th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1322, 127 L.Ed.2d 671 (1994). Moreover, since the government bears the burden of proving its case beyond a reasonable doubt, it must be permitted to exercise its own judgment in determining at what point in an investigation enough evidence has been obtained. We reject Baker's sentencing manipulation argument.

13. Government's Cross–Appeal

■ The government argues on cross-appeal that the district court erred in calculating the defendants' sentences by: (1) failing to increase their offense levels based on the value of funds involved in the money-laundering activities; (2) granting each defendant a two level decrease in his offense level for acceptance of responsibility; (3) decreasing Baker's offense level by four levels for medical reasons; and (4) granting Hale a four level decrease in his offense level for aberrant behavior.

■ The government conceded at oral argument that it never objected to the district court's calculation of the defendants' sentences on any of these specific grounds. Our review of the record confirms this. At most, the government lodged a general objection to the court's calculation of the defendants' offense levels. This is not enough. A challenge to an adjustment of an offense level must be raised *specifically* at sentencing in order to afford the district court an opportunity to correct any potential error. A challenge that is not properly raised in the district court is waived. *United States v. Parker,* 991 F.2d 1493, 1501 (9th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 121, 126 L.Ed.2d 86 (1993); *United States v. Visman,* 919 F.2d 1390, 1393–94 (9th Cir.1990), *cert. denied,* 502 U.S. 969, 112 S.Ct. 442, 116 L.Ed.2d 460 (1991). We therefore decline to consider the government's cross-appeal.

## CONCLUSION

The defendants were properly convicted of all the charges against them. We reject all their challenges to their convictions and sen-

tences. We decline to consider the government's cross-appeal.

AFFIRMED.